COMMONWEALTH *vs.* ROBERT D. GURNEY.

Plymouth. May 4, 1992. - July 14, 1992.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Practice, Criminal*, Medication of defendant during trial, Argument by prosecutor. *Insanity. Evidence*, Relevancy and materiality.

In the circumstances of a criminal trial, the defendant, who was taking antipsychotic medications to control his mental illness, had the right to present evidence to the jury regarding the status of his mental condition during trial and specifically with respect to the treatment of his claimed mental impairment with antipsychotic medication. [100-104]
There was no merit to a criminal defendant's claims on appeal that the prosecutor had improperly vouched for the credibility of the Commonwealth's witnesses and had improperly commented on the defendant's credibility. [104-105]

INDICTMENTS found and returned in the Superior Court Department on July 21, 1986.

The case was tried before *William H. Carey*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William R. Hill, Jr.*, Committee for Public Counsel Services, for the defendant.

*Paul C. Dawley*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On July 21, 1986, a Plymouth County grand jury indicted the defendant, Robert D. Gurney, on charges of assault with intent to rape and larceny of less than $100. After a jury trial in the Superior Court, the defendant was found guilty of both charges. The defendant appeals from the convictions, arguing that the trial judge erred in preventing him from introducing evidence that he was testifying at trial while under the influence of prescribed antipsychotic medica-

tions. Also, the defendant claims that the prosecutor improperly vouched for the credibility of the Commonwealth's witnesses in his closing argument and unfairly commented on the defendant's status as an accused. We transferred the case to this court on our own motion. For the reasons which follow, we reverse and remand the case for a new trial.

We set forth the essential facts of this case as developed at trial. On May 1, 1986, immediately following his release from the detoxification center at Bridgewater State Hospital (center), the defendant moved into the Bridgewater Motel. Over the next few days, the defendant consumed a great deal of alcohol, drinking from morning to night until he fell asleep. At approximately 11 A.M. on May 3, 1986, the defendant became nauseated and confused, experiencing the combined effect of the alcohol he had been drinking and the antibiotics he reportedly took for psoriasis and arthritis. When the defendant decided that he needed medical attention, he went to the restaurant next to the motel and telephoned the center.

Upon returning to the motel, the defendant saw the complainant, a seventeen year old female, sitting on the front steps. The defendant asked her if she needed help. The complainant replied that she did not need any help, and informed the defendant that she was waiting for her boy friend to pick her up. The defendant then returned to his room. The defendant did not close the door to his room, fearing that he would become trapped inside and be unreachable in the event of an emergency.

Shortly thereafter, the complainant appeared at the doorway to the defendant's room. The complainant observed the defendant lying on his bed, watching television, and drinking beer. She knocked on the open door and asked the defendant for the time. According to the complainant, the defendant did not answer, so she returned outside to wait for her boy friend. About five minutes later, the complainant went back into the motel looking for a telephone to call her boy friend. The complainant reappeared at the defendant's doorway and asked him whether there was a telephone in the motel which

she could use. The defendant arose from the bed and walked down the hallway, banging on each of the doors along the way. No one answered any of the doors, and the complainant left the motel and again waited outside for her boy friend.

A few moments later the defendant approached the complainant outside the motel. He told her that a female guest had agreed to let the complainant use her telephone. The complainant consequently went into the motel and knocked on the door indicated by the defendant. No one answered the door. As the complainant turned to leave the motel, the defendant grabbed her, placing one hand over her mouth and the other around her body. The defendant told the complainant that he was not going to hurt her, as he pulled her toward his room. The complainant struggled with the defendant, trying to escape his grip, and called for help. The defendant started tugging on the complainant's pants, and the complainant started screaming. The defendant tried to silence her by putting his fingers in her mouth. Eventually, the complainant was able to free herself from the defendant by kicking him and pulling his hair. She ran outside the motel where she saw her boy friend sitting in his car. The complainant's boy friend drove her directly to the West Bridgewater police station.

The police brought the complainant back to the motel. An ambulance arrived to provide medical assistance to her.[1] While in the ambulance, the complainant identified the defendant as her assailant.[2] The complainant told the police that at the time of the attack she was wearing a gold chain around her neck and had about $72 in her pocketbook. The police retrieved the complainant's gold chain from the floor

[1] During the struggle with the defendant, the complainant sustained cuts inside her mouth and scratches on her face, neck, back, and ears.

[2] The police had located the defendant at a nearby automobile dealership and brought him back to the motel. At that time, the defendant appeared to be functioning normally, according to police.

of the defendant's room and found the complainant's pocket-book on a nearby path.[3]

The defendant testified at trial. He acknowledged that he had received treatment at the center on about one hundred occasions and that he had been diagnosed as suffering from chronic paranoid schizophrenia and alcoholism. The defendant stated that he was extremely paranoid the day he allegedly attacked the complainant and felt very ill due to having ingested antibiotics and a great deal of alcohol within a short period of time. In his paranoid state, the defendant believed that the complainant was coming after him, showing up at his door without explanation. As a result, the defendant believes that he may have "shoved her[ ] . . . pushed her[,] and told her to get away." The defendant explained that his memory is very poor as a result of his mental illness.

1. *Evidence concerning the defendant's use of antipsychotic medication during the trial.* Dr. Wesley Profit, a licensed clinical psychologist and the director of forensic services at Bridgewater State Hospital, testified at trial regarding the defendant's illnesses and the treatment he received at the center. Dr. Profit also discussed generally the effect of alcohol intoxication on mental illness of the type suffered by the defendant. On direct examination, defense counsel sought to elicit testimony from Dr. Profit regarding the medications then being prescribed for and taken by the defendant. The Commonwealth objected to this evidence. At a sidebar conference, defense counsel explained to the judge that he expected Dr. Profit to testify that three or four of the fourteen medications regularly taken by the defendant were antipsychotic medications which were prescribed to control the defendant's mental illness. The judge disallowed the proffered testimony, and the defendant seasonably objected to the ruling.

---

[3]The police did not find any money in the complainant's pocketbook. However, the defendant had about $63 in his pocket at the time of his arrest.

On appeal, the defendant contends that the judge erred in preventing Dr. Profit from testifying as to the type and effect of the medications prescribed to and taken by the defendant at the time of the trial. More specifically, the defendant argues that the jury ought to have been informed that, during the trial, the defendant was under the influence of antipsychotic medication and his outward appearance was substantially affected thereby. This fact, the defendant states, should have been considered by the jury when assessing his character and credibility, as well as deciding whether he possessed the specific intent to commit the crimes charged. In support of his argument, the defendant relies on *Commonwealth* v. *Louraine*, 390 Mass. 28, 33-34 (1983), where this court held that the State and Federal Constitutions required that a defendant charged with murder, who was under the influence of antipsychotic medication at the time of trial, be afforded the opportunity to have a jury observe him in an unmedicated state. The defendant asserts that the principles supporting the *Louraine* holding apply in the present case and he is therefore entitled to a new trial. The defendant points, more particularly, to our acknowledgment in *Louraine* that "unfair prejudice" befalls a defendant whose controlled outward appearance is not explained, in appropriate circumstances, as the consequence of antipsychotic medication. *Id.* at 35. The defendant argues that, since he has the right under *Louraine* to insist on appearing before the jury in an unmedicated condition, it logically follows that he is entitled to present evidence to the jury that the condition in which he appears before them is controlled by medication. In any event, the defendant states that the judge's decision to exclude the expert testimony on this issue denied him his right to present the jury with any and all evidence which is probative of his mental condition, both during and after the alleged crime. See *id.*

The Commonwealth takes the position that evidence of the defendant's mental condition at the time of the trial is not relevant to the central issue concerning his mental state at the time of the alleged crimes, and hence the testimony

about the medications was rightly excluded. Furthermore, the Commonwealth claims that the jury could reasonably and logically have inferred from the admitted testimony that the defendant was taking prescription medications to control his mental illness at the time of trial. Therefore, the Commonwealth argues, the defendant was not prejudiced by the lack of direct testimony on this point. Finally, the Commonwealth argues that the *Louraine* case is distinguishable from the present case. The Commonwealth argues that the *Louraine* decision applies exclusively to situations involving defendants who plead insanity, or a lack of criminal responsibility, as a defense to a murder charge. The Commonwealth further states that, in any event, the defendant failed to request the remedy offered by *Louraine* — appearance before the jury in an unmedicated condition — and, as a result, he forfeited any right he may have had under *Louraine*. We agree with the defendant.

Although this case differs in significant respects from the situation presented in *Louraine*, we believe that the reasoning there is useful to our present discussion.[4] This court accepted the view in *Louraine* that juries are likely to focus on a defendant's demeanor when considering evidence relating to a claim of diminished mental capacity, and we agreed that it would not be unusual for a jury improperly to discredit such evidence because the defendant appears to be perfectly sane at the time of trial due to the quieting effect of antipsychotic medication. *Louraine*, *supra* at 34-35. We further indicated that it is axiomatic that a defendant is entitled to present to the jury "any evidence which is at all probative of his mental condition," both before and after the alleged commission of a crime. *Louraine*, *supra* at 34, and cases cited. Moreover, we commented that "[e]xpert testimony is to be 'unrestricted in stating all that is relevant to the defendant's mental illness.' " *Louraine*, *supra* at 34, quoting *Common-*

---

[4]We do not consider here, as we did in *Louraine*, a defense of insanity or a defendant's request to appear in an unmedicated condition before the jury.

*wealth* v. *Callahan*, 386 Mass. 784, 792 (1982). For these reasons, we held that that defendant had the right to present himself to a jury in an unmedicated condition and allow the jury to assess his demeanor in that state.

On the basis of these principles, we conclude that the defendant should have been allowed to present evidence to the jury regarding the status of his mental condition during trial. The decision to prevent the jury from considering the defendant's use of antipsychotic medication may have weighed unfavorably against him because the jury thereby were allowed to conclude something based on the difference between his controlled behavior at trial and the psychosis from which he claimed to have suffered at the time of the alleged crimes, without knowing that factors beyond the defendant's control contributed to that difference. In his defense, the defendant testified that he had a history of mental illness and uncontrolled alcoholism and that these conditions prevented him from forming the specific intent to rape the complainant. The jury were entitled to know that, during this testimony and throughout the trial, the defendant's claimed mental impairment was being treated with antipsychotic medication.

It is important to note that the defendant mistakenly reads *Louraine* as granting him the unrestricted right to appear in an unmedicated condition before the jury. To the contrary, we specifically stated in *Louraine* that not every defendant who routinely is treated for mental illness is entitled to be observed by the jury in an unmedicated state. *Louraine,* *supra* at 37-38. Indeed, we remarked that, "in some cases, the defendant's demeanor in an unmedicated condition will not be relevant." *Id.* at 38. We reaffirm this position now and add to it our conclusion that evidence of a defendant's medicated condition at trial also will not be relevant in every case. We adhere to the view that it is best to decide whether evidence of this nature is admissible on a case-by-case basis. *Louraine, supra* at 37-38, and cases cited. The relevance of the evidence in the present case is obvious in light of the fact that the defendant testified at trial and defended solely on

the ground that his mental illness prevented him from forming the intent to commit the crimes charged.

2. *The prosecutor's closing argument.*The defendant also claims a new trial on the basis of alleged improper comments by the prosecutor during closing argument. The defendant asserts that the prosecutor improperly vouched for the credibility of the Commonwealth's witnesses and invited the jury to consider the defendant's status as an accused when considering his credibility and character. These arguments are without merit.

According to the defendant, the statements made by the prosecutor relating to the credibility of the police officers and the complainant constituted prejudicial, reversible error in this case.[5] We disagree. After reminding the jury that they were the final arbiters of credibility in this case, the prosecutor properly suggested during his closing argument that the jury ought to believe the Commonwealth's witnesses because their testimony was reasonable and that they had no reason to target the defendant with false accusations. There is nothing questionable about these statements. Cf. *Commonwealth* v. *Haskins*, 411 Mass. 120, 121 (1991) (setting forth categories of improper arguments). Similarly, we regard the prosecutor's statements regarding the defendant's credibility as falling well within the bounds of proper argument. Contrary to the defendant's assertion, the prosecutor did not base his statements on his personal knowledge of the defendant. Rather, it appears clear that the prosecutor urged the jury to

---

[5]The defendant challenges the following portions of the argument:

"[The defendant] is a complete stranger to [the complainant]. She doesn't have any bias . . . or prejudice against him. Certainly, she doesn't have any interest in the outcome of the case."

"The police officers, do they have a bias in this case? No. They don't know this man. They are professional police officers; among them they've a couple of decades worth of experience. They're doing their job. They're presenting facts. They do not have any bias or interest and their testimony was eminently reasonable."

"I would ask you to consider the testimony of the Defendant in this case. Does he have an interest in the outcome of this case? Well, ladies and gentlemen, he's on trial. I suggest to you that it is clearly obvious that he does have an interest in the outcome of the case."

reach a particular result through arguing permissible infer-
ences from the facts presented at trial. See *Commonwealth
v. Nordstrom*, 364 Mass. 310, 315 (1973).

The judgments are reversed, the verdicts are set aside, and
the case is remanded for a new trial.

*So ordered.*