## Commonwealth *vs.* William Zagrodny.

Plymouth. October 7, 2004. - December 20, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Sosman, JJ.

*Evidence,* Voluntariness of statement. *Practice, Criminal,* Voluntariness of statement, Voir dire, Assistance of counsel, Instructions to jury, Fees and costs. *Constitutional Law,* Assistance of counsel. *Homicide.*

At the trial of an indictment of murder in the first degree, the trial judge did not err by admitting in evidence statements the defendant made to the police and his family without conducting a hearing on voluntariness, where defendant's counsel made a considered and tactical decision to waive any objection to the admission of the statements, and the judge did not need to obstruct that strategy by conducting a voir dire [96-98]; moreover, no ineffective assistance of counsel arose from defendant's counsel's not manifestly unreasonable decision to waive any such objection, as the statements to the family were not coerced, and the statements to police were rendered involuntary neither by any mental impediment from which the defendant suffered nor by any defective Miranda waivers [98-102].

At a murder trial, defense counsel's decision to call the defendant to testify as his first witness did not extend beyond the range of reasonableness and thus did not substantiate a claim of ineffective assistance of counsel [102-103]; moreover, there was no merit to the defendant's argument that his trial counsel failed to prepare him adequately for his testimony [103], and it was not manifestly unreasonable for trial counsel not to seek an order terminating the defendant's medication or to inform the jury of the effect of the mood-altering medications the defendant claimed he was taking, where it was far from clear that the defendant was not medicated at the time of the killing, or that he was medicated during the trial, and where focusing on the defendant's medication would have had certain undesirable effects [104-105].

A Superior Court judge's flawed instruction on provocation at the trial of an indictment of murder in the first degree did not prejudice the defendant because the evidence did not warrant any instruction on provocation whatsoever. [105-107]

There was no abuse of discretion in a judge's conclusion at a criminal trial that funds the defendant sought for retaining a new psychiatric expert to testify at the hearing on his motion for a new trial were not reasonably necessary, in light of the fact that trial counsel was well informed concerning the defendant's mental state and had hired five experts to testify on behalf of the defendant. [107-108]

Indictment found and returned in the Superior Court Department on March 15, 1993.

The case was tried before *Raymond J. Brassard*, J., and a motion for a new trial, filed on June 20, 2001, was heard by him.

*Kenneth G. Littman* for the defendant.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted of murder in the first degree by reason of extreme atrocity or cruelty. The victim was his wife. The defendant, who testified at trial, admitted that he had killed his wife but asserted that, due to mental illness, he lacked criminal responsibility for her death. Represented by new counsel on appeal, he argues that (1) the judge erred by admitting in evidence statements the defendant made to the police and his family without conducting a hearing on voluntariness; (2) his trial counsel provided ineffective assistance in waiving any objection to the admission of those statements and in certain other respects; (3) the judge's instructions to the jury on provocation were erroneous; (4) he was wrongly denied funds necessary to retain a psychiatric expert to testify at the hearing on his motion for a new trial; and (5) he is entitled to relief under G. L. c. 278, § 33E. We affirm.

1. *Background.* The jury could have found the following. On Thanksgiving Day, November 26, 1992, the defendant and the victim, who had been experiencing tension in their marriage, had an argument. The next morning, the defendant awoke to find the victim preparing to leave their Pembroke home with the couple's two children, a seven year old girl and an eighteen month old boy. The defendant told his daughter to stay out of the bedroom and then, during an argument with his wife, manually strangled her until she became unconscious. The defendant placed his two children into his automobile, but returned to the house to collect clothing and diapers for his infant son. When he realized that the victim was still alive, the defendant stomped on her neck and then cinched a bandana around her throat, causing the injuries from which she died.

After killing his wife, the defendant drove their children toward Maine, where he owned property. Before reaching that destination, the defendant turned around and drove to his mother's house in Weymouth. The defendant testified that he

"told his mother that I hurt [the victim]" and then telephoned his brother, saying, "I think I killed [my wife]." The defendant later confessed more fully to his brother, who telephoned the Weymouth police.

When the Weymouth police arrived, the defendant was twice advised of his Miranda rights and twice acknowledged that he understood those rights. The defendant was also advised by his brother that he did not have to say anything to the police. He nevertheless proceeded to do so. The police described the defendant as "very quiet and subdued," "very calm," "sitting very quietly," and able to communicate clearly and coherently. The defendant testified that as he related the events surrounding the killing, he was "able to control" himself and had decided that he would "take responsibility for [his] actions."

Police officers escorted the defendant to the station, where he signed two written waivers of his Miranda rights. The defendant confessed to the murder in detail. Throughout several hours of questioning and observation by the police, he was calm, quiet, and able to answer questions coherently.

The defendant has a history of mental illness, and at the time of the killing had been prescribed medication for bipolar disorder. Three defense expert witnesses testified that he was suffering from manic psychosis at the time of the killing and that he lacked the ability to know the wrongfulness of or control his actions. The defendant also testified that at the time of the killing, he "didn't know what [he] was doing."

There was other evidence from which the jury could find that at the time of the victim's death, the defendant was in control of his actions and able to tell right from wrong. A psychiatrist for the prosecution testified that he could find no substantial evidence that any mental illness or disorder had impaired the defendant at the time of the killing. The police officers who interviewed the defendant just hours after the killing reported that he was calm, cooperative, and able to relate the events of the morning in significant detail.

The jury could also consider the following facts concerning the circumstances of the killing, on which the Commonwealth's expert relied in part to opine that the defendant could appreciate the wrongfulness of his actions at the time of the killing. The

argument that preceded the victim's death occurred after the defendant told his daughter to stay away from the bedroom in which he later killed his wife. The medical examiner testified that the victim's death was the result not of the defendant's first attack on her, but of his second, which occurred after the defendant had placed his children into his automobile and prepared to flee the scene. The police officers who first investigated the scene of the killing found one door to the bedroom locked and the other blockaded with a crib, facts that the Commonwealth suggested were evidence that the killer knew his actions were wrongful and of an attempt to conceal the crime.

2. *The defendant's confessions.* Trial counsel did not move to suppress statements made by the defendant to the police and his family members. At the commencement of the trial, counsel expressly waived any objection to the admissibility of those statements.[1] Before the Commonwealth introduced the statements, trial counsel informed the judge that the voluntariness of the confessions was a live issue. He nevertheless expressly declined to move to suppress or to conduct a voir dire on voluntariness, requesting only that the jury be instructed that they were to determine the voluntariness of the defendant's confessions. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). The judge so instructed the jury more than once, clearly and forcibly. Trial counsel's decisions were clearly strategic, presumably (as the judge later concluded in ruling on the motion for a new trial)[2] because the defendant's statements "were necessary to present a defense of lack of criminal responsibility."[3]

---

[1] Trial counsel did argue that the defendant lacked competency to stand trial, and the trial was delayed until the spring of 1996, while the defendant's competency was contested. Ultimately, the judge ruled that the defendant was competent to stand trial. During the course of the trial the judge made certain observations about the defendant's demeanor during the trial to the effect that the defendant was behaving entirely appropriately. On appeal, the defendant does not challenge the competency determination made by the judge.

[2] The judge who ruled on the defendant's motion for a new trial was also the trial judge.

[3] No affidavit of trial counsel was filed in connection with the motion for a new trial. See *Commonwealth* v. *Lynch*, 439 Mass. 532, 539 n.2 (2003).

On appeal, the defendant now asserts that the judge had a constitutional obligation to conduct, sua sponte, a hearing to determine whether his statements were voluntary. The argument is meritless. It is clear, as the judge obviously understood, that when voluntariness of a defendant's confession is a live issue, a judge normally must conduct a hearing as to the voluntariness of a confession before such evidence is admitted, proceeding sua sponte in the absence of a motion to suppress. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 503-504 (2003); *Commonwealth* v. *Crawford*, 429 Mass. 60, 65 (1999), quoting *Commonwealth* v. *Tavares*, *supra* at 151 (trial judge has "constitutional obligation to conduct a voir dire examination . . . where the voluntariness of a confession is in issue"). It is equally clear, however, that when a defendant has made a considered and tactical decision not to challenge voluntariness, the judge need not obstruct that strategy by conducting a voir dire. *Commonwealth* v. *Serino*, 436 Mass. 408, 412-414 (2002). Indeed, "it would be anomalous to require a judge to conduct a voir dire and inquire into the issue of voluntariness 'where it might be contrary to the theory and strategy of the defendant.' " *Id.* at 414, quoting *Commonwealth* v. *Benoit*, 410 Mass. 506, 513 (1991). See *Commonwealth* v. *Laurore*, 437 Mass. 65, 80 (2002) (no error when judge failed to conduct voir dire on voluntariness because suppression of defendant's confession would have disrupted reasonable trial strategy). As we explained in some detail in *Commonwealth* v. *Serino, supra*, it is the defendant's right to decide how his case will be tried. There, as here, the defense "may well have determined that the likelihood of suppression was small" and that "[c]ross-examination of the witnesses on the issue of voluntariness would afford them the opportunity to rehearse their responses to defense counsel's questions." *Id.* at 413. See *Commonwealth* v. *Drayton*, 386 Mass. 39, 42 (1982) (discussing tactical considerations involved in waiving voir dire hearing on suppression of identification testimony). And, as the judge later observed, certain details from the defendant's statements formed the basis of the expert opinions concerning his mental state at the time of the killing. See note 6, *infra*. In this case the judge was fully alert to

counsel's strategic choice. The judge acted entirely appropriately in the circumstances. There was no error.

3. *Ineffective assistance.* The defendant asserts that his trial counsel provided ineffective assistance by (a) failing to challenge the admission in evidence of the defendant's statements; (b) calling the defendant to testify as his first witness; (c) failing to prepare the defendant for rigorous cross-examination; and (d) presenting the defendant to the jury in a medicated state and failing to inform the jury that the defendant was medicated at trial. We address each in turn, considering "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge)," and if so, "whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992), citing G. L. c. 278, § 33E. As to claimed errors in trial counsel's strategy, none is established unless we are persuaded that counsel's tactics were " 'manifestly unreasonable' when undertaken." *Commonwealth* v. *Sielicki*, 391 Mass. 377, 379 (1984), quoting *Commonwealth* v. *Levia*, 385 Mass. 345, 353-354 (1982). See *Commonwealth* v. *Lynch*, 439 Mass. 532, 537, 539 (2003), citing *Commonwealth* v. *Finstein*, 426 Mass. 200, 203 (1997) (discussing standard of review applicable to tactical decisions of counsel in trial for murder in first degree). Only "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent" are manifestly unreasonable. *Commonwealth* v. *Levia, supra* at 353, quoting *Beasley* v. *United States*, 491 F.2d 687, 696 (6th Cir. 1974). See *Commonwealth* v. *Degro*, 432 Mass. 319, 333 (2000) ("It is far too easy to examine a transcript and point to ways to 'do it better' "); *Commonwealth* v. *Vinton*, 432 Mass. 180, 186 (2000).

a. *Waiver of challenge to voluntariness.* Ruling on the motion for a new trial, the judge concluded that trial counsel's tactical decision not to challenge the admissibility of the defendant's confessions to his family and the police was not manifestly unreasonable for two reasons: any motion to suppress those statements would have failed, and the exclusion of the statements "would likely have deprived [the defendant] of evidence

that was critical to his lack of criminal responsibility defense." We agree on both grounds.

First, as to the defendant's statements to his family, an admission to a private citizen is admissible unless it is coerced, *Commonwealth* v. *Vazquez*, 387 Mass. 96, 101-102 (1982), even if not the result of "a meaningful act of volition." *Id.* at 102 (admitting in evidence statements by defendant suffering from mental illness). The defendant points to nothing that would suggest that his brother or mother coerced him in any respect to admit to the killing. See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 679-681 (1975), cert. denied, 425 U.S. 959 (1976) (statements coerced by private individuals are inadmissible). Cf. *Commonwealth* v. *Adams*, 416 Mass. 55, 60-61 (1993) (finding reasonable question of voluntariness for purposes of humane practice rule when defendant presented evidence that his mother psychologically coerced his confession to police). As the judge found, the defendant "voluntarily confessed his actions to his brother and mother without any prompting." A motion to suppress the defendant's statements to his family would not have succeeded.

A motion to suppress the defendant's statements to the police also would have failed. The defendant's claim is that his mental illness deprived him of the ability to withhold incriminating information. Faced with such a claim, a judge must determine whether "the statements given were the 'product of a rational intellect as part of the issue of voluntariness." *Commonwealth* v. *Vazquez*, *supra* at 99, quoting *Commonwealth* v. *Chung*, 378 Mass. 451, 457 (1979). On appeal, the Commonwealth does not contest that the defendant suffered from mental illness. But that is not the end of the inquiry. Here, the defendant's expert testified, in the words of the motion judge, that the defendant's bipolar disorder "when active, caused him to suffer from 'discrete manic episodes' accompanied by delusions, auditory hallucinations, lack of concentration and agitation." In contrast to this behavior, when the defendant spoke to the police, both at his mother's home and at the police station, there was evidence that he was "calm" and "alert," and his confessions were chronological and "coherent." See *Commonwealth* v. *Vazquez*, *supra* at 100 ("clarity and detail of the defendant's statements

to the police support a normal memory and a lack of confusion"). The defendant twice informed the police that he had taken the medications prescribed for his bipolar disorder and was "okay."[4] Both the defendant's brother and the police satisfied themselves that the defendant was aware he did not have to make any statement to the police. The defendant confessed only after he had decided to "take responsibility for [his] actions." As the judge noted, "his reaction was consistent with one making a clean breast of matters." We agree with the judge that "there is no reason to conclude that any mental impediment [the defendant] suffered impeded his ability to . . . make a voluntary statement."

Even if voluntary, the defendant's statements to the police could have been suppressed had the defendant been able to establish that the statements were the product of defective Miranda waivers, as the defendant now argues.[5] They were not. A Miranda waiver is valid if the Commonwealth proves that the waiver was "made knowingly, intelligently, and in all respects, voluntarily," notwithstanding a defendant's mental illness. *Commonwealth* v. *Rivera*, 441 Mass. 358, 364-367 (2004) (analyzing Miranda waiver in appeal from conviction of murder in first degree on unsuccessful lack of criminal responsibility defense); *Commonwealth* v. *Beland*, 436 Mass. 273, 282 (2002) (same). Here, there would have been no basis to exclude the defendant's confessions for want of a valid waiver, for much the same reasons we described in connection with our inquiry into the voluntariness of the defendant's statements to the police. The testimony of the police, of the defendant's brother, and even of defense expert witnesses all support the judge's conclusion that, taking into account the defendant's mental illness, his waivers were knowing, intelligent, and voluntary.

---

[4]Two of the defendant's experts opined that the defendant's behavior in the weeks preceding the killing suggested that he was not taking his medication consistently and was not fully medicated on the day of the killing.

[5]The defendant has suggested that, pursuant to *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 446-449 (2004), the jury should have been instructed on the failure by the police to make an audio-taped recording of the defendant's confession. Our ruling in that case provides only prospective relief. See *Commonwealth* v. *Dagley*, 442 Mass. 713, 721 (2004). There was no error.

In light of the negligible, at best, chance of success on any motion to suppress, trial counsel's strategy not to challenge the admissibility of the statements was not manifestly unreasonable. Rather, trial counsel and the defense experts affirmatively used specific details from the defendant's statements that might have been indicative of a compromised mental state, to further his defense of lack of criminal responsibility.[6] All of the witnesses to the confessions told the jury that the defendant repeatedly had expressed remorse for his actions, and that he appeared contrite and concerned about his wife's death. Counsel sought to persuade the jury that the actions and affect of the defendant in the hours after the killing validated the defense experts' testimony — that the "calmness" of the defendant as he gave his statement was consistent with his bipolar disorder, and that the defendant's "realization of the enormity of what he had done" had allowed him to overcome his manic psychosis.

Faced with overwhelming evidence of the circumstances of the killing and the testimony concerning the defendant's affect when he arrived at his mother's house and in the succeeding hours, we cannot say that counsel's decision to use the statements affirmatively was unreasonable. See *Commonwealth* v. *Laurore*, 437 Mass. 65 (2002). In fact, had the defendant's statements been excluded, the prosecution likely would have called the defendant's eleven year old daughter to testify, for she witnessed many of the events surrounding the killing. While the confessions allowed the jury to see the defendant as an emotional and contrite man, testimony by his daughter, bolstered by overwhelming physical evidence of the circumstances of the killing, could have left a very different impression. Trial counsel's decision not to challenge the voluntariness of the Miranda waiver did not represent the kind of "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent." *Commonwealth* v.

[6]The defendant's statements to the police, which were made before any interaction with counsel or experts, supported both the expert witnesses and the defendant's own trial testimony about his mental state at the time of the killing. For instance, trial counsel elicited testimony from the defendant, consistent with his statements on the day of the killing, that his wife's green eyes had "turned all black" and "foggy" before the fatal attack.

*Adams*, 374 Mass. 722, 728 (1978). See *Commonwealth* v. *Lynch*, 439 Mass. 532, 537, 539 (2003).

b. *The defendant's testimony.* The Commonwealth called as its final witness a medical examiner, whose testimony, combined with autopsy and crime scene photographs of the victim, was graphic. The defendant now contends that trial counsel erred by calling him to testify as the first witness for the defense because he added nothing to the defense, and because he was too distraught at the time to respond effectively to the prosecutor's cross-examination. Here, too, we agree with the judge's conclusion that counsel's decision did not extend "beyond the range of reasonableness." *Commonwealth* v. *Adams*, 374 Mass 722, 730 (1978).

A decision whether and when to call a witness is a matter of tactical strategy, giving rise to error only when the decision to call the witness was "manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). See *Commonwealth* v. *Britto*, 433 Mass. 596, 602-603 (2001). As explained by the judge, trial counsel had good reason to call the defendant, and to call him immediately following the medical examiner. As the judge noted, "in many ways [the defendant] was his best witness." Recalling his own observations of the trial, the judge recollected that the defendant "[t]hroughout his testimony . . . repeated that he loved [the victim] and did not know what was happening when he killed her." While other witnesses gave testimony that supported the defendant, his own words, said the judge, "had the most potential to persuade the jury."

As to the timing of the defendant's testimony, the jury heard the defendant testify that he was a caring husband, confused, and deeply sorry for what he had done.[7] His testimony could have neutralized the impact of the medical examiner's testimony by immediately presenting the defendant, as the judge noted, "in a vulnerable, remorseful state." Trial counsel's decision to

[7] As the judge noted, the autopsy pictures that the defendant now argues made him too distraught to respond effectively to cross-examination were in fact used by his trial counsel to elicit helpful testimony from the defendant relating to his defense of lack of criminal responsibility.

call the defendant as his first witness represented the reasonable tactic of attempting to convince the jury that the defendant was a deeply troubled man who was not criminally responsible for his wife's death.[8]

c. *Preparation of the defendant.* The defendant contends that trial counsel failed to prepare him adequately for his testimony, as evidenced (he claims) by the testimony elicited by the prosecutor on cross-examination.[9] As the judge succinctly summarized, the record is otherwise. It is clear that during the three years in which trial counsel represented the defendant, he became well acquainted with the defendant's mental history and appropriately arranged for the defendant to be assessed by psychiatric experts. He visited the defendant twice in the month prior to trial, and conferred with his client immediately prior to his testimony.

Ruling on the defendant's motion for a new trial, the judge made findings to support his ruling that trial counsel adequately prepared the defendant. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999). We afford special deference to factual findings where, as here, the motion judge also presided at the defendant's trial. *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 467 (1998). That in hindsight the defense strategy was not wholly successful because the defendant did not fare well under cross-examination, does not mean that more preparation would have made a difference or that trial counsel was ineffective. See *Commonwealth* v. *Adams, supra* at 728-729.

---

[8]The Commonwealth also points out that calling the defendant as the first witness circumvented the Commonwealth's ability to cross-examine the defendant about a written statement concerning the killing that the defendant had provided one of his experts. The judge ordered the defendant to produce a copy of the statement to the Commonwealth when a defense expert explained that he had relied on this written statement to form his opinion.

[9]Under cross-examination, the defendant testified that on the morning of the killing, he knew he "had done something wrong" and knew that it would be "wrong and illegal" to kill his wife. He testified that he had been able to "control" his first attack on his wife. The defendant admitted that he was able to stop the attack for at least two minutes while he prepared to leave with the children, and that, around the time of the killing, he was able to control his actions and make decisions.

d. *The defendant's medication.* The defendant contends that he was medicated at the time of trial,[10] the effects of which, he argues, concealed from the jury his true mental condition as it was at the time of the killing. He argues that it was ineffective for trial counsel not to seek an order terminating the defendant's medication or to inform the jury of the effect of the mood-altering medications he claims he was taking.

A defendant usually has the right to appear at trial in an unmedicated state. *Commonwealth* v. *Louraine*, 390 Mass. 28, 32-38 (1983). When a defendant is medicated at trial, he may introduce evidence of the effect of that medication, if it is relevant to the issues in the case. *Commonwealth* v. *Gurney*, 413 Mass. 97, 103-104 (1992). Nevertheless, in this case, we agree with the judge who concluded that neither the defendant's unmedicated demeanor nor evidence of his medicated condition "was of such relevance to his lack of criminal responsibility defense so as to warrant a new trial" on the ground that trial counsel was ineffective.

First, as the Commonwealth persuasively argues, it is far from clear that the defendant was not medicated at the time of the killing.[11] Nor is it clear that he was medicated during the trial.[12] The judge found that the defendant refused to take his medication on April 8, 1996, less than two weeks prior to his trial, and that he did not submit any medical records from that date to the end of his trial, some three weeks later, to establish that he was medicated during that period. The only evidence that the defendant was in fact medicated at trial was his own affidavit, signed nearly five years after the trial, which the judge gave "little weight." See note 3, *supra.* Cf. *Commonwealth* v.

[10] In an affidavit submitted in support of his motion for a new trial the defendant claimed that during the trial he had been taking Depakote, a mood stabilizer and anti-epileptic drug; Trazodone, an antidepressant; and Mellaril, an antipsychotic medication.

[11] The defendant had been prescribed medication for bipolar disorder for several years prior to the homicide. On the day of the killing, the defendant twice told the police officers who interviewed him that he had taken medication that morning. At trial, the defendant testified that he could not remember having taken his medication on the day of the killing. See note 4, *supra.*

[12] The judge found that the record is "replete" with instances where the defendant determined when and what medication he would take.

*Gurney, supra* at 103 (no question that defendant was being treated with antipsychotic medication during trial); *Commonwealth* v. *Louraine, supra* at 33 (expert testified at pretrial hearing that defendant was receiving maximum dosages of antipsychotic medication).

Trial counsel may have "strategically straddled," in the words of the judge, the issue of the defendant's medication because a full exploration of that subject might have led to conclusions that would have compromised the lack of criminal responsibility defense. Focusing on the defendant's medication would have alerted the jury to the defendant's history of taking his medication inconsistently, allowed the prosecution to emphasize the defendant's admission that he had taken his medication before killing his wife, and drawn attention to his ability to behave appropriately during trial, even though he may not have been taking his medications as prescribed. Lacking an affidavit from trial counsel that sheds any light on the issue, we cannot say that counsel's tactics in this regard were manifestly unreasonable. See *Commonwealth* v. *Adams, supra* at 729-730.

4. *The jury instruction on voluntary manslaughter.* The defendant requested an instruction on provocation, to which the Commonwealth did not object. There was no specific objection to the instruction as given.[13] The Commonwealth now points out that the judge's instruction on provocation contravened *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998).[14,15] We agree, but conclude that the error did not prejudice the

---

[13]While the defendant did not object specifically to the language of the judge's instruction on provocation, he asserts here that his proposed jury instructions and objection to the portion of the instruction on "cooling of passions" constituted sufficient objection that we should apply the prejudicial error standard of review. We need not resolve that claim because the error did not prejudice the defendant.

[14]"The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Commonwealth* v. *Lynch*, 439 Mass. 532, 542-543 (2003), quoting *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998).

[15]The trial in this matter occurred two years before our decision in *Commonwealth* v. *Acevedo, supra.*

defendant, because we are not persuaded that the evidence warranted any instruction on provocation.[16]

A provocation instruction need not be given unless there is evidence, viewed in the light most favorable to the defendant, that is "sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738 (1985), cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). The defendant argues that the victim's statement on the morning of the killing that "I am leaving and taking the kids" required an instruction on provocation. But here the medical evidence was uncontroverted that the victim died from wounds inflicted during the second attack, when there had been more than sufficient time for the defendant to cool off. See *Commonwealth* v. *Brum*, 441 Mass. 199, 205-206 (2004) (manslaughter instruction not required where no evidence "that makes a theory of reasonable provocation or sudden combat tenable"); *Commonwealth* v. *Groome, supra* at 221.

Even if we ignore any "cooling off" period, the victim's "leaving" her husband and "taking" their children is not evidence of provocation sufficient to warrant a voluntary manslaughter instruction. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 513-514 (1997), *S.C.*, 433 Mass. 439 (2001) (victim's statement to defendant that "he would never see his child again" not sufficient to warrant manslaughter instruction). See also *People* v. *Arnold*, 17 Ill. App. 3d 1043, 1047 (1974) (victim's silence when asked to give defendant custody of their children not basis for manslaughter instruction on provocation).[17] Even jarring marital disputes provoked by adultery do not war-

---

[16]On appeal the Commonwealth apparently concedes that the evidence raised the issue of "heat of passion," noting only that "the defendant stated that the victim was leaving him and taking the children."

[17]Other jurisdictions hold consistently that a victim's termination of a romantic relationship cannot constitute adequate provocation to warrant a manslaughter instruction. See, e.g., *People* v. *Ramirez*, 56 P.3d 89 (Colo.

rant a voluntary manslaughter instruction unless the defendant has suddenly discovered the victim's infidelity. See *Commonwealth v. Rodriguez*, 431 Mass. 804, 812 (2000); *Commonwealth v. Brown*, 387 Mass. 220, 227-228 (1982). See also *Commonwealth v. Vatcher*, 438 Mass. 584, 588-589 (2003), and cases cited (arguments among adults do not constitute reasonable provocation). Here, there was no suggestion of infidelity nor any indication that the marital tension between the victim and the defendant was sudden — indeed, the relationship between the victim and the defendant had been strained by financial difficulties and they had argued the day before the killing.[18] A voluntary manslaughter instruction was not required in this case.

5. *Funds on motion for a new trial.* In connection with his motion for a new trial, the defendant sought to hire a new expert with funds pursuant to G. L. c. 261, § 27C.[19] The defendant argues that additional expert testimony would have bolstered the contentions made in his motion and repeated here,

---

2002) (reviewing case law in other jurisdictions and concluding that "[c]ourts across the country examining the issue have also generally concluded that a victim's rejection of the defendant's affections is not sufficient to constitute a highly provoking act that would excite an irresistible urge in a reasonable person").

[18]We have reviewed the record for any conduct of the victim not identified by the defendant that, when viewed in its light most favorable to the defendant, might have provided evidence sufficient to warrant a voluntary manslaughter instruction. There is none. A police officer testified that the victim had told the defendant, "That's it. I'm leaving and taking the kids." At some point, according to the defendant, the victim said, "You'll get yours." As we explain, the victim's statements do not constitute provocation. The defendant himself asserted that an argument then "ensued" and he "began choking his wife until she was unconscious." The defendant stated that when he returned to the house the victim "came off the bed" and "grabbed" him, and that the victim "fought strongly" and "fought hard," in the defendant's words. That the victim tried to thwart the defendant's attempt to strangle her is not evidence of provocation. The defendant was not entitled to a voluntary manslaughter instruction on a theory of heat of passion on reasonable provocation. Nor was there evidence sufficient to warrant a voluntary manslaughter instruction on the theories of heat of passion induced by sudden combat, or excessive force in self-defense.

[19]General Laws c. 261, § 27C, provides, in pertinent part, that an indigent defendant shall not be denied "extra fees and costs if . . . reasonably necessary to assure the [defendant] as effective a . . . defense or appeal as he would have if he were financially able to pay."

that he did not confess voluntarily to the police and his family, and that evidence of the effects of his medications should have been introduced at trial. The judge concluded that additional expert testimony would not assist the defendant's case; he rejected the defendant's request for funds on the ground that the testimony sought was not "reasonably necessary."[20] We review for abuse of discretion the judge's findings as to the reasonableness of a defendant's request for G. L. c. 261, § 27C, funds. *Commonwealth* v. *Murphy*, 442 Mass. 485, 510 (2004).

We have already concluded, *supra*, that the trial decisions the defendant sought to repudiate in his postconviction motion were reasonable tactical choices. This is not a case where there was no expert evidence at the trial itself, or where trial counsel simply ignored a plausible defense. Trial counsel was well informed concerning the defendant's mental state and called five experts to testify on his behalf. As the judge noted, those five experts had the benefit of interviewing the defendant shortly after the killing, "observing his demeanor and his emotional state." There was no abuse of discretion in the judge's conclusion that in these circumstances, funds to hire a new expert were not "reasonably necessary."

6. *G. L. c. 278, § 33E, review.* Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the whole case on the law and the evidence. The record contains evidence of the defendant's mental illness. But not every defendant suffering from bipolar disorder or other mental illness lacks criminal responsibility for his acts. Here, the circumstances of the crime and the testimony of lay and expert witnesses alike provided evidence for the jury to find that the defendant was criminally responsible under the test described in Model Penal Code § 4.01 and adopted in *Commonwealth* v. *McHoul*, 352 Mass. 544

---

[20]The judge also ruled that the type of expert testimony that the defendant sought would not normally be subject to the G. L. c. 261, § 27C, provision of funds. In his renewed motion for funds, and here, the defendant asked for reconsideration in light of changes in the apposite rules. See *Commonwealth* v. *Murphy*, 442 Mass. 485, 510 (2004) (discussing amendments to Mass. R. Crim. P. 30 [c] [5], as appearing in 435 Mass. 1501 [2001], which authorize allowance of costs associated with new trial motions). Because we uphold the judge's ruling that the funds sought were not "reasonably necessary," we need not address the judge's second, independent rationale for denying funds.

(1967). See *Commonwealth* v. *Fernandes*, 436 Mass. 671, 676 (2002). The experienced judge was plainly attuned to the issues, evidentiary and otherwise, that the defendant's mental illness and attendant trial strategy presented. We find no occasion to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of guilt.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*