COMMONWEALTH VS. EDWARD H. LYNCH, JR.

Plymouth. March 7, 2003. - June 12, 2003.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury, Jury and jurors, Discovery, Capital case. *Constitutional Law,* Assistance of counsel, Confrontation of witnesses. *Homicide. Jury and Jurors.*

At a murder trial, defense counsel did not provide ineffective assistance in failing to call additional witnesses; in staging a reenactment of the struggle between the defendant and the victim; and in not objecting to, moving to strike, or seeking a limiting instruction in response to evidence regarding the defendant's temper and in response to a statement made in the prosecutor's closing argument about the defendant's disposition; such decisions were not manifestly unreasonable, nor did they create a substantial likelihood of a miscarriage of justice. [537-541]

At a murder trial, the judge's denial of the defendant's motion for a new trial, based on the alleged violation of the defendant's right to confront witnesses against him when a prosecution witnesses wore sunglasses that concealed his eyes while he testified, was not erroneous and did not create a substantial likelihood of a miscarriage of justice. [541-542]

At a murder trial, the judge's instruction on involuntary manslaughter, which contained an error in the assignment of the burden of proof that constituted grounds for reversal in *Commonwealth v. Acevedo,* 427 Mass. 714, 716 (1998), did not, in the context of a charge that repeatedly emphasized that the Commonwealth bore the burden of proof beyond a reasonable doubt on all the elements of the crime charged, create a substantial likelihood of a miscarriage of justice. [542-544]

At a murder trial, the judge properly denied the defendant's request for a postverdict inquiry of the jurors regarding memorial buttons worn by certain members of the victim's family, where the defendant failed to make an adequate showing that any of the jurors were exposed to the buttons, and, if they were, that such exposure influenced their deliberations. [544-545]

At a murder trial, the judge did not abuse his discretion in denying the defendant's motion for funds to conduct discovery and investigate other information in support of his appellate claims, where the defendant failed to establish a prima facie case for relief. [545]

INDICTMENT found and returned in the Superior Court Department on January 26, 1997.

The case was tried before *Stephen E. Neel,* J., and motions for a new trial, for funds to conduct postconviction discovery, and for a reduced verdict were heard by him.

*Emanuel Howard* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

CORDY, J. After a jury trial, Edward H. Lynch, Jr., was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. He subsequently filed motions for a new trial, for funds to conduct postconviction discovery and other investigations, and for a reduced verdict. The motions were denied by the same judge who presided at the trial, and Lynch's appeal therefrom was consolidated with the direct appeal from his murder conviction.

The claims argued on appeal principally arise out of the denial of Lynch's motion for a new trial. He first contends that his trial counsel was ineffective in failing to call three additional witnesses to testify as to the voluntariness of statements he made to the State police after his arrest; in failing to object, to move to strike, or to seek a limiting instruction regarding the prosecutor's cross-examination of a defense expert; and in conducting an ineffective reenactment of the stabbing of the victim during Lynch's direct examination. Lynch next claims that a prosecution witness wore sunglasses during his testimony, depriving Lynch of eye to eye contact in violation of his constitutional right of confrontation, and that the judge's instruction regarding voluntary manslaughter impermissibly shifted the burden of proof on provocation, thereby creating a substantial likelihood of a miscarriage of justice. Lynch also claims that a postverdict inquiry of the jury should have been conducted regarding whether memorial buttons worn by the family of the victim were observed by the jury and acted as an extraneous influence on their deliberations, and that it was error to deny his motion for funds to conduct posttrial discovery and investigations. Finally, Lynch asks this court to exercise its power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. Following our review of the entire record of the proceedings pursuant to G. L. c. 278, § 33E, we affirm the conviction and find no basis on which to grant relief.

*Background.* We recite the facts as the jury could have found them in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised.

In June, 1992, Lynch resided in a two-room cottage on the grounds of a hog farm in Lakeville. He was employed by the owner of the farm to perform various chores including feeding the pigs and caring for the grounds of the farm, and was allowed to live in the cottage rent free. Early in the afternoon of June 5, 1992, Lynch took a taxicab to a bar in Taunton where he proceeded to drink "twelve to fourteen bottles of beer" over a period of several hours. At approximately 7 P.M. he moved on to another bar in Taunton, the Lounge 44, where he remained until it closed at 1 A.M., leaving only once for ten minutes around 9:30 P.M. to purchase a pint bottle of vodka. While at Lounge 44, Lynch drank beer and, after it closed, huddled in a doorway sipping his bottle of vodka and napping until 6 A.M., when he entered a luncheonette and had breakfast. After breakfast, Lynch returned to Lounge 44 and resumed drinking. Between 8 A.M. and 2 P.M. when Lynch finally left Lounge 44, he had consumed (according to his testimony) approximately seven bottles of beer and seven rum and cokes.

At noon, Andrea Geremia entered Lounge 44. Lynch perceived her to be a prostitute, and in the course of a brief conversation, Geremia agreed to engage in sexual activity with him in exchange for fifty dollars. At 2 P.M. they left in a taxicab driven by Fred Howe. Howe had driven Lynch home from bars in Taunton on "quite a few" occasions, and, on this occasion, did not think Lynch was intoxicated.

Lynch and Geremia entered his cottage and sat at the kitchen table for some period of time. She drank a soft drink and he had two beers. He gave her fifty dollars which she tucked into her bra. They then proceeded to the bedroom where Geremia attempted to perform oral sex on Lynch, who was unable to become aroused and passed out before the sexual act was completed. Sometime thereafter, Lynch awoke to the sound of a squeaky dresser drawer being opened. He saw Geremia walking away from the drawer with her hand down her shirt and believed that she had stolen his money. He became angry and followed

her into the kitchen where she confronted him with a ten-inch boning knife. Lynch, at six feet, two inches tall and weighing 180 pounds, easily overpowered the much smaller Geremia, grabbed the knife from her, and stabbed her in the chest and stomach. He then watched as she bled to death. The next day Lynch used a front-end loader to bury Geremia's body in a trench on the farm used for the disposal of dead pigs. Her disappearance remained unsolved, and her whereabouts unknown, until early in 1993.

In or about October, 1992, while incarcerated at the Plymouth County house of correction on unrelated charges, Lynch confided in another inmate, Steven Moosick, that he had stabbed "a girl" he suspected of robbing him and had buried her body. Moosick conveyed the information to another inmate and the police eventually interviewed Moosick. Acting on this information, the State police and Lakeville public works personnel uncovered Geremia's body on January 4, 1993, buried on the hog farm alongside pig carcasses. Her body was badly decomposed but was identified through dental records. A forensic pathologist determined that Geremia had been stabbed five times in the chest and abdomen, each of the wounds sufficient to be fatal by itself. Two other wounds were evident on her back and side.

By the time Geremia's body was discovered, Lynch had been released from custody. At approximately 9:30 P.M. on January 4, 1993, State police found Lynch sleeping in the living room of a friend's apartment. He was arrested and taken to the State police barracks were he was advised of his Miranda rights. He was questioned at the barracks from approximately 10 P.M. until midnight, during which he admitted meeting a woman in Lounge 44, returning to his cottage with her, passing out and awakening to find her taking money from his drawer, snatching a knife from her, stabbing her with it once in the stomach, watching her die, burning her clothes, and dumping her body in a trench on the farm.

At trial, Lynch's defense was that the stabbing had occurred in self-defense or was accidental, that as a result of heavy drinking, his sense of reality was altered at the time of the stabbing, and that the statements he made to the State police on January

4, 1993, were not voluntary. On the witness stand, Lynch denied intentionally stabbing Geremia and testified that she was stabbed inadvertently in the course of a struggle during which Geremia herself held the knife, tried to stab him, kneed him in the groin, and slapped him about the head and face. On realizing she had been stabbed, Lynch testified he tried to stop the bleeding by pressing a dish towel onto the stab wound. Lynch and his trial counsel conducted a choreographed reenactment of this struggle for the jury in which trial counsel portrayed Geremia.

The defense also presented evidence regarding Lynch's extensive history of alcohol abuse, including two specific events: Lynch's heavy consumption of alcohol on June 5 and 6, 1992, just prior to the stabbing, and a drinking binge just prior to his arrest that Lynch claimed lasted seventeen days from December 19, 1992, to January 4, 1993, and included two friends, Donald Podzka and Patricia MacDonald.

Dr. James Lukes testified as the defense expert on the effects of alcohol addiction, excessive drinking, and withdrawal from alcohol on human perceptions, reactions, reason, and anxiety. He testified about "blackout[s]" (periods of time during which a very intoxicated person may appear sober and competent to the casual observer and may perform intricate tasks unconsciously and successfully, but will have no memory of the task), "confabulation" (which occurs when a person confuses reality with fantasy or present circumstance with unrelated past experience, and melds the two together to create a cogent story of events), and "delirium tremors" (which occur when a person goes through the end stage of detoxification and may suffer hallucinations and delusions as well as severe physical illness). Dr. Lukes then opined that, given the events of June 5 and June 6, a hypothetical person with Lynch's history and in Lynch's position on the afternoon of June 6 would have awoken from his passed out state "feeling numb" and could have been "working in a blackout" or "hallucinating" during the period when Geremia was stabbed. Dr. Lukes also opined that, given the nature of the seventeen-day drinking binge, a hypothetical person with Lynch's history and in Lynch's position on the evening of January 4, 1993, would have awoken from his slumber with some anxiety, would have been unable to cogently answer specific

questions, and "[r]ecall would be very poor"; he would have been "uncoordinat[ed]," "very agitated," and "very restless." He also testified that Lynch had been a heavy user of alcohol for twenty-five years and had developed a very high tolerance for it.

*Ineffective assistance of counsel.* In cases of murder in the first degree, we review claims of ineffective assistance of counsel by ascertaining whether there was error committed by the judge, defense counsel, or the prosecutor, and if so whether such error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Kosilek*, 423 Mass. 449, 457-458 (1996); *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). A tactical decision of trial counsel is not error unless it is shown to be "manifestly unreasonable." *Commonwealth* v. *Finstein*, 426 Mass. 200, 203 (1997), and cases cited.

a. *Failure to call additional witnesses.* Lynch filed a motion to suppress the statements he made to the State police after his arrest on January 4, 1993, asserting that his alcoholic condition made them involuntary. He also made voluntariness an issue at trial, seeking and receiving a humane practice instruction. In each proceeding, he called three witnesses to support his contention (and his own testimony) as to his consumption of alcohol and the effects he was suffering at the time of his statements to the police. Donald Podzka and Patricia MacDonald were drinking with Lynch on January 4, 1993, and testified that Lynch had been drinking all during the day, concluding early in the evening when he went to sleep in their living room. Dr. Lukes testified as an expert witness on the likely effects of the consumption of the quantities of alcohol testified to by Lynch, Podzka, and MacDonald.[1] Lynch claims that his counsel was ineffective because he failed to call three additional witnesses (John Hoey, Dr. Cornelius Kiley, and Patricia MacDonald's daughter Kimberly) to testify at each of these proceedings. Lynch asserts that if these three witnesses had been called, they would have provided further testimony supporting his claim that his statements were involuntary.

---

[1]The State police sergeant who interviewed Lynch on the night of January 4, 1993, testified that Lynch showed no signs of inebriation or withdrawal during the interview and that Lynch told her that he had not had a drink since 9 A.M. that morning.

Only Hoey provided an affidavit explaining what he would have testified to had he been called as a witness. At the time of Lynch's arraignment, Hoey was a staff writer for The Enterprise, a Brockton newspaper. Although he asserted no independent memory of Lynch's physical, mental, or emotional condition during his arraignment on January 5, he states in his affidavit that he would have testified as to what other people said at the arraignment, statements he later quoted in his article on Lynch's arraignment published on January 6, 1993. Such testimony offered for the truth of the matter asserted would have been inadmissible hearsay, see *Commonwealth* v. *Figueroa*, 422 Mass. 72, 77 (1996); *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 5 (1995), and counsel can hardly be faulted for not presenting it.

Neither Dr. Kiley nor Kimberly submitted affidavits. Through appellate counsel's affidavit, Lynch claims that Dr. Kiley, the court psychiatrist who interviewed him on the day of his arraignment, would have testified that Lynch was suffering from alcohol withdrawal at the time of his arraignment. Similarly, he claims that Kimberly (whose last name, address, and telephone number are apparently unknown) would have testified that Lynch was drinking and was "ossified" when she stopped by to drop off groceries at the apartment where Lynch, Podzka, and MacDonald were drinking, between 5 and 6 P.M. on January 4, 1993 (four to five hours before his arrest and subsequent statements). This affidavit is inadequate to sustain Lynch's claim that trial counsel was ineffective, and a new trial required.

First, the affidavit of appellate counsel as to what Dr. Kiley and Kimberly would have testified is inadmissible hearsay, and the motion judge acted well within his discretion in concluding that it failed "to present facts or make supportable sworn offers of proof of expected evidence sufficient to require a new trial." See *Commonwealth* v. *Francis*, 432 Mass. 353, 372 (2000). Second, with respect to Dr. Kiley, his written evaluation of Lynch's condition on January 5, 1993, belies the assertions in appellate counsel's affidavit. Dr. Kiley categorized Lynch as "alert," with "moderate" anxiety, a "normal" rate of speech, "connected" thought processes, "unimpaired" concentration, and "unimpaired" reality testing. The evaluation noted that

Lynch exhibited "some body tremors," but made no mention of suspected alcohol withdrawal. From this evaluation, it would have appeared to trial counsel that had Dr. Kiley been called to testify at the hearing his testimony would have been favorable to the Commonwealth on the question of Lynch's ability to think and communicate clearly, and not favorable to Lynch. Third, the testimony of Kimberly, assuming she was available to counsel and would have testified as appellate counsel claims, would have been cumulative of the testimony of Donald Podzka and Patricia MacDonald.

In sum, Lynch has failed to meet his burden of demonstrating that trial counsel's decision not to call these additional witnesses was manifestly unreasonable or created a substantial likelihood of a miscarriage of justice.[2]

b. *Faulty reenactment.* Lynch also claims that his trial counsel was ineffective because he presented the jury with an awkward reenactment of the struggle between Lynch and Geremia that Lynch claimed resulted in Geremia's stabbing. During Lynch's direct examination, trial counsel asked Lynch to step down from the witness stand and demonstrate his struggle with Geremia. Lynch's trial counsel, who was six feet tall, played the part of five-foot tall Geremia in the demonstration.[3] The crux of Lynch's complaint in this regard is that the height difference between trial counsel and Geremia created such an awkward

---

[2] It is significant that no affidavit from trial counsel was submitted in connection with Lynch's motion for a new trial. *Commonwealth* v. *Serino*, 436 Mass. 408, 415-416 (2002) (affirming denial of motion for new trial based on claim of ineffective assistance of counsel where motion was not supported by affidavit of trial counsel); *Commonwealth* v. *Vasquez*, 55 Mass. App. Ct. 523, 533-534 (2002) (affirming denial of motion for new trial, and noting conspicuous absence of affidavit from trial counsel in support of motion); *Commonwealth* v. *Savage*, 51 Mass. App. Ct. 500, 505 n.6 (2001) (same).

[3] The transcript of the demonstration is as follows:

DEFENSE COUNSEL: "Your Honor, may the witness step down and demonstrate?"

THE JUDGE: "Yes, he may."

DEFENSE COUNSEL: "Now, pretend I'm Andrea Geremia. You say the knife was in her right hand, correct?"

THE DEFENDANT: "[Witness nods head.]"

DEFENSE COUNSEL: "And you say she lunged towards you with a knife?"

THE DEFENDANT: "[Witness nods head.]"

depiction of the struggle that it damaged Lynch's defense.[4] Lynch also claims that the reenactment was not rehearsed.

In support of this claim, Lynch submitted his own affidavit and the affidavit of appellate counsel. Contrary to the assertions in Lynch's affidavit, the affidavit of appellate counsel states that trial counsel and co-counsel told him that the reenactment was not hindered by any height difference between trial counsel and Geremia, and that the reenactment had probably been rehearsed.

The judge who witnessed the reenactment and also heard Lynch's posttrial motions, found that "[t]he decision to reenact the stabbing was not manifestly unreasonable" and "was a valid tactical decision." The judge's decision in this regard is entitled to substantial deference, *Commonwealth* v. *Jackson*, 428 Mass. 455, 466 (1998), and we see no reason to afford it any less. The decision to stage the reenactment was not manifestly unreasonable and did not create a substantial likelihood of a miscarriage of justice.

---

DEFENSE COUNSEL: "Now using me and doing it gently, would you show the members of the jury what happened between you and her, and as you do it say it verbally to the reporter what you're demonstrating. Go ahead."

THE DEFENDANT: "I grabbed her by the arm like this, then put my hand over her hand, my right hand over her hand. And when I did that, that's when she kneed me in the groin."

DEFENSE COUNSEL: "And when she kneed you in the groin what happened?"

THE DEFENDANT: "I went down on one knee."

DEFENSE COUNSEL: "Go ahead."

THE DEFENDANT: "And I just kept pushing her back and pushing her back. I thought she was slapping me in the face with her free hand, and she's trying to swap the knife into her free hand. And I just held, held on like this, and I pushed her back and pushed her back until she couldn't go back anymore. She was against the washing machine, and that's when I noticed she had been stabbed."

DEFENSE COUNSEL: "And when you noticed she had been stabbed, what did you see?"

THE DEFENDANT: "The blood. My head was down because she was smacking me in the face. Her blood was dripping on the sleeve and on my knee and my thigh."

DEFENSE COUNSEL: "Can he go back on the witness stand, Your Honor?"

THE JUDGE: "Yes."

[4]We fail to see how it would have assisted the defense to use someone of Geremia's small stature during the demonstration, as it would only have emphasized how much larger Lynch was and how unlikely his claim of self-defense was.

c. *Cross-examination of defense expert.* Lynch claims that his counsel was ineffective in not objecting to, moving to strike, or seeking a limiting instruction in response to what he claims was inadmissible and unduly prejudicial evidence elicited by the prosecutor regarding Lynch's temper, and in response to a statement made by the prosecutor during his closing argument about Lynch's "nasty" disposition.

On cross-examination Lynch's expert was asked about information contained in one of the documents on which he had relied in giving his direct testimony concerning Lynch's lengthy history of alcoholism and the likely effects of alcohol on Lynch's state of mind at the time of the stabbing and at the time of his statements to the State police. Specifically, he was asked about a survey Lynch had filled out in 1986, while participating in an alcohol treatment program, in which Lynch had ranked "controlling your temper" as his second goal to be achieved along with sobriety. This cross-examination was not objected to by counsel, nor was it objectionable. Having strategically introduced his own alcoholic history into the trial through the testimony of an expert witness, Lynch may not turn around and complain that some portion of that history is prejudicial or too remote. See *Commonwealth* v. *Key*, 381 Mass. 19, 28-29 (1980). Cross-examination of the underpinnings of an expert witness's testimony is a valid line of inquiry, see *Commonwealth* v. *Funches*, 379 Mass. 283, 292 (1979), and trial counsel's failure to object to such cross-examination was neither error nor manifestly unreasonable.

Similarly, where the prosecutor's statement in his closing argument that the jury could "infer from this evidence" that Lynch was a "nasty drunk" was properly based on the evidence, it was not manifestly unreasonable for trial counsel to decide not to object, move to strike, or seek a limiting instruction with respect to it.

*Sunglasses allegedly worn by a witness.* Lynch claims that he is entitled to a new trial because his right to confront witnesses against him was violated when Steven Moosick, a witness for the prosecution, allegedly wore sunglasses that concealed his eyes while he testified. In his ruling on Lynch's motion for a new trial, the judge properly deemed this issue to have been

waived as it was not raised at trial. He also declined to resurrect it. We review the claim to determine whether there was error, and, if so, whether it created a substantial likelihood of a miscarriage of justice. The claim has no merit.

The only evidence that Moosick was wearing sunglasses during his testimony comes from Lynch's affidavit. By contrast, appellate counsel's affidavit relates that Lynch's trial counsel did not recall Moosick's wearing glasses at all, and that his co-counsel recalled Moosick's wearing tinted glasses but did not characterize them as dark. The prosecutor at trial also submitted an affidavit that he had no recollection of Moosick's wearing sunglasses during his testimony and that as a matter of trial practice he would never let a witness testify while wearing sunglasses because doing so would undermine the witness's credibility. On this record, Lynch has failed to establish that Moosick wore sunglasses, dark enough to conceal his eyes, during his testimony.

Even if Moosick had worn dark glasses of some type, there is no basis on which to conclude that it created a substantial likelihood of a miscarriage of justice. "Face to face" confrontation does not mean "eye to eye," see *Commonwealth* v. *Kater*, 409 Mass. 433, 446 (1991), and wearing dark glasses does not prevent exposure of a witness's face.[5] See *Morales* v. *Artuz*, 281 F.3d 55 (2d Cir.), cert. denied sub nom. *Morales* v. *Greiner*, 537 U.S. 836 (2002) (witness's wearing dark sunglasses while testifying did not violate right of confrontation under Sixth Amendment to United States Constitution).

*Jury instructions.* Because there was evidence of provocation, the judge properly gave an instruction on voluntary manslaughter. "The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998). The judge's instruction on

---

[5]Article 12 of the Massachusetts Declaration of Rights provides that "every subject shall have a right . . . to meet the witnesses against him face to face." See *Commonwealth* v. *Johnson*, 417 Mass. 498, 500-502 (1994).

this subject contained the same error that led to our reversal of the murder conviction in *Commonwealth* v. *Acevedo, supra.*

Specifically, in defining voluntary manslaughter, the judge stated that "[i]n order to prove the defendant guilty of voluntary manslaughter the Commonwealth must prove three elements beyond a reasonable doubt: First, that the defendant inflicted an injury upon Andrea Geremia from which she died; second, that the defendant injured Andrea Geremia as a result of a sudden combat or in the heat of passion or using excessive force in self-defense; and third, that the homicide was committed unlawfully, without legal excuse or justification, and was not an accident." This instruction errs in the assignment of the burden of proof. *Commonwealth* v. *Acevedo, supra.* It was not objected to at trial. The Commonwealth concedes that an *Acevedo* error was made, but contends that in light of the instructions as a whole the error was not sufficient to create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fickling,* 434 Mass. 9, 18-20 (2001) *(Fickling).*

In *Fickling,* we held that an *Acevedo* error did not create a substantial likelihood of a miscarriage of justice, where the judge also correctly and repeatedly instructed the jury that where there is evidence of provocation the prosecution has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion; the "center of gravity" of the provocation instruction was not on the side of misstatement; and the judge's charge, read as a whole, could not have been understood to relieve the Commonwealth of its burden to prove beyond a reasonable doubt every element of the crime. *Commonwealth* v. *Fickling, supra* at 20. Our review of the charge as a whole leads us to the same conclusion here.

As in *Fickling,* the judge followed his incorrect instruction by correctly instructing that "[w]here there is evidence of provocation the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion." Later in his instruction, the judge again emphasized that "[t]he Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion on sudden provocation. You may not return a verdict of guilty of murder unless the Commonwealth meets this burden."

Although the judge then repeated the original incorrect instruction, the "center of gravity" of the charge plainly rested on the side of the correct instruction. In the context of a charge that repeatedly emphasized that the Commonwealth bears the burden of proof beyond a reasonable doubt on all the elements of the crime charged, we do not perceive a substantial likelihood of a miscarriage of justice.

*Postverdict inquiry of jury.* Lynch claims that the jurors may have been improperly influenced by memorial buttons worn outside the court room by five to ten members of Geremia's family, and, consequently, a postverdict inquiry of the jurors (first sought in his motion for a new trial) should have been conducted.

The buttons were white with a rose and bore the inscription "In Memory of Andrea Rose Geremia, 12-9-61, 6-6-92." There is no indication in the record of the size of the buttons. Before the trial commenced, and out of the jury's presence, the prosecutor brought the buttons to the judge's attention, and the judge ordered that no buttons be worn in the court room. The judge also asked that no buttons be worn anywhere in the court house, but did not explicitly prohibit it outside the courtroom. At no time during the trial, pre- or postverdict, did Lynch request that the jurors be examined as to whether they had actually seen the buttons.

Prior to empanelment, all of the jurors indicated their indifference to the case, and, following empanelment, the judge explicitly instructed them to avoid any extraneous information about the case. In particular, the judge cautioned the jury against exposure to information about the case even while they were in the court house. Absent any evidence to the contrary, the jury are presumed to follow the judge's instructions. *Commonwealth v. Britto*, 433 Mass. 596, 612 (2001).

No evidence was presented with Lynch's motion for a new trial that any juror had been either exposed to the buttons or influenced by them. The only evidence that the buttons were even worn in the court house comes from the affidavits of Lynch who claims he saw people wearing the buttons in the hallway outside the court room, and from his appellate counsel who

claims Patricia MacDonald told him she saw one person wearing a button outside the court room.

"Postverdict interview[s] should be initiated only if the court finds some suggestion that there were extraneous matters in the jury's deliberation." *Commonwealth* v. *Fidler*, 377 Mass. 192, 203 (1979). Such inquiries are not favored in the absence of some showing of illegal or prejudicial intrusion into the jury process. *Id.* Therefore, "the party seeking judicial investigation must make a colorable showing that an extrinsic influence may have had an impact upon the jury's impartiality." *Commonwealth* v. *Dixon*, 395 Mass. 149, 151-152 (1985). This showing must be more than speculation. *Commonwealth* v. *Gilchrist*, 413 Mass. 216, 219-220 (1992); *Commonwealth* v. *Dixon*, *supra* at 150; *Commonwealth* v. *Fidler*, *supra* at 193. The question of the adequacy of a defendant's showing is left to the sound discretion of the trial judge. *Commonwealth* v. *Dixon*, *supra.*

Lynch has failed to make an adequate showing that any of the jurors were exposed to the buttons, and, if they were, that such exposure influenced their deliberations. The judge properly denied Lynch's request for a postverdict inquiry of the jurors.

*Denial of Lynch's motion for funds.* Along with his motion for a new trial, Lynch filed a motion for funds to conduct discovery and investigate other information in support of his appellate claims.[6] The motion for funds was denied, and Lynch now claims that that denial was an abuse of discretion. "Before postconviction discovery may be ordered, a defendant must establish 'a prima facie case for relief' " supported by affidavits. *Commonwealth* v. *Tague*, 434 Mass. 510, 519 (2001), cert. denied, 534 U.S. 1146 (2002), quoting Mass. R. Crim. P. 30 (c) (4), 378 Mass. 900 (1979). Lynch's self-serving affidavit and the affidavit from appellate counsel failed to establish a prima facie case for relief and, therefore, for postconviction discovery. In these circumstances, the denial of the motion for funds was not an abuse of discretion.

---

[6]Appellate counsel sought funds to depose Kimberly, Dr. Kiley, Dr. Lukes, John Hoey, Lynch's trial counsel and co-counsel, and several keepers of records. Counsel also sought funds to hire an investigator to obtain sworn statements from witnesses regarding the memorial buttons and Moosick's alleged sunglasses.

*Relief under G. L. c. 278, § 33E.* We have reviewed the complete record of the proceedings in this case as is our responsibility pursuant G. L. c. 278, § 33E, and see no basis for exercising our authority to reduce the jury's verdict or to grant Lynch any other relief.

*Conclusion.* Lynch's conviction of murder in the first degree is affirmed. The denials of his motions for new a trial, for funds, and for a reduced verdict are also affirmed.

*So ordered.*