J-S20021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CHRISTOPHER JOSEPH SMARR | : | |
| | : | |
| Appellant | : | No. 1179 WDA 2018 |

Appeal from the Judgment of Sentence Entered March 29, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0003415-2015

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED JULY 03, 2019**

Christopher Joseph Smarr appeals from the judgment of sentence entered following his convictions for first-degree murder, robbery, and related charges. Smarr contends that the trial court erred in allowing a Commonwealth witness to testify while wearing a scarf; that the court erred in permitting testimony about a previous robbery and the deactivation of a Facebook account without sufficiently linking these acts to Smarr; and that incontrovertible physical facts regarding the bullet trajectory contradict the testimony of the sole eye-witness to the shooting. We affirm.

The Commonwealth brought charges against Smarr based on allegations that just before midnight on March 14, 2015, he shot and killed the victim, Brandon Gray. The shooting occurred during a robbery, as part of a "turf war" between rival drug dealers.

Prior to trial, the Commonwealth filed a motion seeking to introduce testimony indicating Smarr had committed a prior, similar crime. The Commonwealth alleged that a witness, Jeffrey Patterson, would testify that unidentified men robbed him as he left the Garden Inn in New Stanton after he conducted a cocaine sale. The Commonwealth stated that Patterson would say that Smarr was present during the sale, and that Patterson's attackers – whose faces he did not see – warned him not to sell drugs there again. The Commonwealth asserted that other trial testimony would establish that one hour later, Gray also was robbed at the Garden Inn, after selling drugs to Smarr. The Commonwealth argued that the two incidents were part of a common scheme, plan, or design, and the testimony of the earlier robbery was relevant to establish Smarr's motive for the shooting and identify him as the shooter.

The court granted the motion, and allowed Patterson to testify. In ruling on the motion, the court stated, "[T]he nexus is too close in time, place and method of these two events. They are similar enough such that the evidence should be admitted. And both are essentially drug deals and take backs." N.T., Trial, 12/5/16-12/9/16, at 40-41.

Smarr proceeded to a jury trial, and 29 witnesses testified over the course of the five-day trial. Janay Brown, the sole eye-witness to the shooting, appeared for trial wearing a scarf that covered her face except for her eyes. Smarr objected, when Brown took the stand to testify, that Brown's covering her face prevented the jury from seeing her demeanor. The court conducted

a short hearing, outside the presence of the jury, regarding the purpose and necessity of the scarf. Brown stated that she is Muslim and covered her face in observance of her religion. The court described the face covering as a "colorful scarf" and a "winter scarf, a scarf that anybody would wear." *Id.* at 95. Brown replied that her religion allows her face covering to be any color or material, and that she does not always wear a face covering. Brown said she wears a face covering on Fridays, when she goes to a religious service, and "whenever [she] feels like [she] want[s] to." *Id.* at 96. Brown also testified that she was wearing the scarf in court that day out of concern for her safety.

The court overruled the objection. The court stated,

[A]lthough the witness [sic] or the jury is not able to see her mouth, they can observe her demeanor, they can observe her posture, they can observe the way she speaks and the manner that she speaks. And there is a religious issue there. I'm going to err on the side of protecting those religious rights.

*Id.* at 100-101. The court stated it would allow Smarr to question Brown before the jury on why she was wearing the headdress.

Brown testified that Gray was her boyfriend, and that on the date of the murder, an acquaintance named Tammy Vrable contacted Gray and asked him to come to the Garden Inn to sell her cocaine. When Brown and Gray arrived at the Inn, Gray sold cocaine to both Vrable and a man known as "Jason," who was later identified as Mark Schofield.

Later that same night, Vrable again contacted Gray and asked him to come to the Garden Inn to sell her more cocaine. This time, as Gray and Brown

were arriving at the Inn, they passed Schofield, who told them he was leaving to make a heroin sale. Gray and Brown again met Vrable, and a young man who called himself "Jason's little brother." Brown identified Smarr, in court, as the person who had called himself "Jason's little brother."

Brown testified that she stood outside the door to the hotel room while Gray conducted the drug sale inside. After Gray reemerged, Brown and Gray proceeded down the hallway, heard someone running behind them, and turned around. Brown testified that Smarr pointed a gun at them and stated, "Yo, I'm gonna need mine back." *Id.* at 115, 118. After Gray responded, "I'm not gonna give you nothing back, you're gonna have to shoot me," Smarr shot him, and Gray fell to the ground. *Id.* at 115.

Brown testified that when Smarr shot Gray, they were facing each other, and standing five feet apart. When Smarr's counsel asked Brown, "And at no point during this did [Gray] turn and go to run?" Brown responded, "No. There wasn't enough time for that. Right after [Gray] said, '[N]o, I'm not giving you anything,' he shot him and [Gray] fell to the ground." *Id.* at 184. Brown stated that she believed Gray was shot on his right side, near his armpit or rib area, but was not sure of the exact location. She did not recall the position of Gray's arms during the shooting.

Brown testified that Smarr then said to her, "[B]itch, get the fuck out of here or I'm going to kill you too." *Id.* at 115. Brown ran back to her vehicle, called 911, and then ran back to Gray, who was lying on the ground. An ambulance took Gray to a hospital, where he died. Brown testified that she

gave a description of Smarr and Schofield to the police, and a few days later, identified Smarr as the shooter in a photographic lineup.

Following Brown's testimony, Smarr made an oral motion for a mistrial, arguing that Brown's covering her face violated his right to physical face-to-face confrontation and the federal and state constitutions. In arguing against the motion, the prosecutor stated on the record that despite the scarf, the jury could view Brown's demeanor

> through her body actions, through her arm movements, her voice, frustration, lack of frustration, all of that came out with her when she testified on the stand. I think at different times on the stand she broke down into tears, she got upset. All that was visible. I even think any emotion she showed or any reaction she showed I think was visible to the jury.

*Id.* at 273. Smarr did not argue that the prosecutor mischaracterized Brown's emotions, but generally argued that the face covering prevented the jury from seeing Brown's demeanor and expression.

The court denied the motion for a mistrial. The court said that the scarf was "a bit transparent" and pulled tight such that the jury could adequately judge Brown's demeanor:

> Thinking back on what I observed yesterday, certainly she had her mouth covered for the most part and kept pulling on it, but most of her nose was exposed a lot of the time. I was sitting so close to her. So, you couldn't see her mouth, but the scarf, she had it pulled so tight I could see her mouth. . . .
>
> I could see -- it wasn't like a loose scarf. I could see the outline of her mouth. I could see if she was smiling or frowning. . . .
>
> It did seem a bit transparent. So, I don't believe in being able to observe her, and Mr. Smarr, the way the courtroom is set up is

- 5 -

only feet from her. It's not a distance at all. And the jury is only feet from her. So, I don't believe there was any violation of the right to confront.

And with regard to her religious right, yes, she did say that she wears the head dress when she wants to. But that's her right; whenever she wants to wear her head dress, she wears her head dress. So, you know, I believe that's appropriate to allow her to do so. And she did have the scarf on the front, but then she had a more formal wrap on the back of her head which would be more the traditional way I saw on the back.

*Id.* at 275-76. Smarr did not dispute the court's statements that the scarf was pulled tight, and was transparent, such that Brown's mouth was essentially visible.

Subsequently, Dr. Cyril Wecht testified regarding Gray's autopsy. Dr. Wecht testified that the bullet wound was located on the right side of Gray's chest, near his armpit area, and that the bullet entered Gray's right chest and stopped in his left chest cavity. According to Dr. Wecht, the trajectory of the bullet was "from right to left, from up downward, and a little bit from front to back." *Id.* at 304. Dr. Wecht stated that the bullet wound indicated the victim "was either standing in a more sideward position, so to speak, as to, you, just being face on. Or possibly turning, you know, if he sees the gun." *Id.* at 306. He testified that the wound was "pretty close" to a 90-degree angle from the front of Gray's body, and that it was "closer to perpendicular," than to "head-on." *Id.* at 319. He stated that Gray might have been shot while turning his torso away from the shooter, without moving his feet.

The Commonwealth also presented Patterson's testimony about the prior robbery. He testified that at 10:30 p.m. on the date of the murder, "Rico"

asked him to deliver cocaine to a customer at the Garden Inn. *Id.* at 407. Patterson went to the Inn and sold cocaine to the customer, who he identified as Schofield. Patterson testified that Smarr was also present during the sale, and discussed the quality and quantity of cocaine with Schofield before Schofield purchased the drugs from Patterson.

Following the sale, as Patterson was leaving the Inn, he heard two people come up behind him, felt a gun in his back, and was ordered to lie face-down on the ground. The men took the money Schofield had given Patterson, but intentionally returned Patterson's car keys to him. Patterson did not see his assailants, and testified that he did not know whether Smarr had been one of the robbers. After the robbery, as Patterson walked away from the hotel, he heard two people yell to him, "[D]on't worry, dude, it's not you, we're trying to make a statement to Rico." *Id.* at 416. The people also told Patterson "to stay out of this spot, it's ours, or mine, or whoever." *Id.*

After Patterson testified, Smarr moved for a mistrial. The court stated, "We have, for lack of a better word, a drug deal and then almost immediately a take back before the person ever leaves the hotel. It's the same hotel. It's within an hour of each other. The money is taken back. Nothing else is taken." *Id.* at 442. The court denied the motion.

Corporal James Mazurik of the Pennsylvania State Police testified regarding the process by which law enforcement had identified Smarr. Corporal Mazurik testified that he reached out to Detective Tony Marcocci of the Westmoreland County Detective Bureau to determine if he was aware of

anyone using the nickname "Jason's little brother." Corporal Mazurik and Detective Marcocci contacted several informants, who told them that "Jason's little brother" also went by the nickname "Boo" or "Boots," and provided the police with his photograph.

Corporal Mazurik testified that, meanwhile, Trooper Teko Angeliccio had located Schofield's Facebook account.[1] Corporal Mazurik searched through Schofield's Facebook friends, and found an account bearing the name "Mickey Boot," which had a profile picture that matched the individual in the photograph given to the police. Corporal Mazurik testified that he accessed the Facebook account two days after the murder, on March 16, but that the account had been deactivated when he subsequently tried to view it.

Smarr objected to the testimony that the Facebook account had been deactivated. Smarr argued that the testimony was irrelevant, because there was no evidence establishing that Smarr had deactivated the account, or why. The court overruled the objection, but allowed Smarr to cross-examine Corporal Mazurik on evidence establishing whether Smarr had deactivated the account. Corporal Mazurik testified on cross-examination that he did not know who deactivated the account.

---

[1] Facebook is a social networking website where users must provide a name and e-mail address to establish an account. *See Commonwealth v. Mangel*, 181 A.3d 1154, 1159 (Pa.Super. 2018). Users may then add other users as "friends," post content to their account which is accessible to their friends, and communicate with their friends through chats or messages. *Id.*

Corporal Mazurik testified that the State Police sent both the photograph provided by the informant and the photograph retrieved from Facebook to the McKeesport Police Department. The McKeesport Police informed the State Police that they knew the individual in the photographs to be Smarr. Smarr was subsequently identified in photographic lineups by Vrable; John Ely Toman, who had been in the hotel room when Gray had sold drugs to Smarr; Brown; and Patterson.[2]

In its closing statement, the Commonwealth argued, *inter alia*, that Smarr had a Facebook account, and that within days of when Trooper Mazurik accessed it, the account was "gone." *Id.* at 924-25. The Commonwealth argued that this showed Smarr's consciousness of guilt and indicated that he did not want the police to find out his identity.

During its charge to the jury, the court gave the following cautionary instruction regarding Patterson's testimony:

> You heard evidence tending to prove that [Smarr] participated in a robbery for which he is not on trial. I am speaking of the testimony to the effect that Jeff Patterson was robbed by two individuals following a drug transaction involving [Smarr] approximately one hour prior to the present incident. This evidence is before you for a limited purpose. That is for the purpose of tending to show the identity of the shooter, a common plan or scheme in both incidents, or a motive for the homicide. This evidence must not be considered by you in any way other than for that purpose I just stated. You must not regard this evidence as showing that the defendant is a person of bad

_____

[2] Vrable, Toman, and Kristi Hay each identified Smarr at trial as the person who called himself "James's little brother," who Gray had sold drugs to just before the murder. They also testified that Smarr left the room following the sale.

character or criminal tendency from which you might be inclined to infer guilt.

*Id.* at 941-42.

The jury found Smarr guilty of first-degree murder, robbery, theft by unlawful taking, receiving stolen property, and firearms not to be carried without a license.[3] The court sentenced Smarr to an aggregate of 45 years' to life imprisonment. Smarr filed post-sentence motions, including a motion for a new trial based on the court's evidentiary rulings and a motion for a judgment of acquittal based on the incontrovertible physical facts rule. The trial court denied the motions.

Smarr filed this appeal, in which he raises the following issues:

1. Whether the court below erred in allowing the sole eyewitness to testify with a face covering, thus precluding the jury from being able to observe her facial expressions, and denying appellant's right to confront witnesses against him.

2. Whether the court below erred in allowing Rule 404(b) bad act testimony of a prior robbery in which the victim therein was unable to identify the appellant as having participated in such robbery.

3. Whether the appellant is entitled to judgment of acquittal pursuant to the incontrovertible physical facts rule, due to the fact that incontrovertible physical facts relating to the gunshot trajectory demonstrate that the sole eyewitness's version of events could not have occurred as described.

4. Whether the court below erred in allowing testimony that a Facebook page putatively belonging to [Smarr] was taken down shortly after the homicide to show consciousness of guilt, despite no evidence being presented to show that [Smarr] was the one

_____

[3] 18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), 3921(a), 3925(a), and 6106(a)(1), respectively.

- 10 -

who took the page down, or even had any knowledge that it was being taken down.

Smarr's Br. at 5-6 (suggested answers omitted).

## I. Confrontation Clause

Smarr argues that the court erred in allowing Brown to testify while wearing a scarf over part of her face because this denied Smarr his right to face-to-face confrontation under the Confrontation Clauses of the federal and state constitutions. Smarr argues that Brown's testimony was impermissible under the test announced in **Maryland v. Craig**, 497 U.S. 836 (1990), for two reasons. First, Brown testified she only wears the scarf on Fridays, when she attends religious services at the Jum'ah, and whenever she feels that she wants to; she did not testify her religion required her to wear the scarf while testifying, and it was therefore unnecessary to allow her to do so. Second, Smarr contends the reliability of Brown's testimony was not otherwise assured, as the jury were unable to clearly see Brown's facial expressions and thus fully assess her demeanor and credibility.[4]

The United States and Pennsylvania Constitutions provide criminal defendants the right to confront those who testify against them at trial. **See** U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy

---

[4] Smarr also argues that the court should not have allowed Brown to wear the scarf due to her safety concerns, since Brown only testified to a general fear for her safety. However, as the court did not allow Brown to wear the scarf in order to protect her safety, and we affirm the court's decision to allow Brown to wear the scarf for religious reasons, we need not address this argument.

the right . . . to be confronted with the witnesses against him");[5] Pa. Const. Art. 1, § 9 ("In all criminal prosecutions the accused hath a right . . . to be confronted with the witnesses against him"). The rights afforded by the two Confrontation Clauses are coextensive. *Commonwealth v. Geiger*, 944 A.2d 85, 94-95, 97 n.6 (Pa.Super. 2008); *accord Commonwealth v. Atkinson*, 987 A.2d 743, 745 (Pa.Super. 2009).[6] Whether a defendant has been denied the right to confrontation is a question of law, over which we exercise *de novo* and plenary review. *Atkinson*, 987 A.2d at 745.

In *Maryland v. Craig*, the United States Supreme Court explained that the right to confrontation includes the following elements: (1) the witness testifies while face-to-face with the defendant; (2) the witness testifies under oath and (3) under the penalty of perjury; (4) the witness is subjected to cross-examination; and (5) the jury is able to observe the demeanor of the witness, "thus aiding the jury in assessing his [or her] credibility." 497 U.S. at 845-46. The Court held that the Confrontation Clause is not violated when a defendant is denied the first element, "a physical, face-to-face confrontation

_____

[5] The Confrontation Clause of the Federal Constitution is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Commonwealth v. Atkinson*, 987 A.2d 743, 745 n.1 (Pa.Super. 2009).

[6] Previously, the Confrontation Clause of the Pennsylvania Constitution required face-to-face confrontation. *See Commonwealth v. Ludwig*, 594 A.2d 281 (Pa. 1991). Pennsylvania's Confrontation Clause was amended in 2003 to remove the reference to face-to-face confrontation and conform its language to that of the Federal Constitution. *See Commonwealth v. Williams*, 84 A.3d 680, 682 n.2 (Pa. 2014); *Atkinson*, 987 A.2d at 745 n.2; *Geiger*, 944 A.2d at 94 n.5.

at trial," so long as 1) "denial of such confrontation is necessary to further an important public policy" and 2) "the reliability of the testimony is otherwise assured" (hereinafter, "the **Craig** test"). **Id.** at 849-50; **accord Atkinson**, 987 A.2d at 750.

We conclude that Smarr has failed to establish that he was denied a physical, face-to-face confrontation with Brown. Smarr and Brown were in the same room, sitting within a few feet of each other, when Brown testified. **Cf. Craig**, 497 U.S. at 851 (distinguishing testimony via one-way video-conferencing from "live, in-person testimony" and holding that former is not face-to-face confrontation); **Atkinson**, 987 A.2d at 751 (holding two-way video-conferencing not constitutionally equivalent to physical face-to-face confrontation). In addition, Brown's eyes were unobstructed. **Cf. Craig**, 497 U.S. at 851 (emphasizing one-way video-conferencing was not face-to-face confrontation because it prevented witness from seeing defendant while testifying); **Coy v. Iowa**, 487 U.S. 1012, 1014-15, 1019-20 (1988) (holding testimony given while screen was positioned between defendant and witness stand, preventing witness from seeing defendant, did not satisfy face-to-face confrontation).[7] No precedent has established that a witness's clothing or

_____

[7] In **Coy**, the Supreme Court explained that the witness's ability to look at the defendant and the jury's ability to observe whether the witness does so are paramount to face-to-face confrontation. **Coy**, 487 U.S. at 1019-20. The Court observed that a witness may be less likely to lie about a defendant, or will lie less convincingly, when in the presence of and looking upon the defendant. **Id.** at 1019. The Court also noted that the trier of fact may "draw its own

accessories renders a physical, in-court confrontation other than face-to-face, particularly where the clothing does not obstruct the witness's eyes, and we decline to do so under the facts of this case. We therefore hold that Smarr's right to be brought face-to-face with his accuser was satisfied.[8]

Even if we were to conclude that Smarr was denied face-to-face confrontation with Brown, we would affirm the trial court's finding that the testimony was permissible under the *Craig* test. Assessing the first prong of the test, the trial court found that allowing Brown to wear the scarf "was necessary to further an important public policy." Opinion and Order, 7/30/18, at 21. The court elaborated,

> The public policy interest involved in the instant case is the protection of the right to freedom and free exercise of religion. Brown consistently testified that she wore her head scarf for

conclusions" about testimony based on whether the witness looks at the defendant or not. *Id.* The Court found that the screen placed between the witness stand and the defendant "was specifically designed to enable the complaining witnesses to avoid viewing [the defendant] as they gave their testimony" and that "[i]t is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id.* at 1020 (citation omitted).

[8] We note that other jurisdictions have concluded that partial face-coverings do not undermine the face-to-face aspect of confrontation. *See Morales v. Artuz*, 281 F.3d 55, 60, 61-62 (2d Cir. 2002) (finding that trial court's decision to allow witness to wear dark sunglasses did not diminish face-to-face encounter under Confrontation Clause because "the obscured view of the witness's eyes . . . resulted in only a minimal impairment of the jurors' opportunity to assess her credibility"); *Commonwealth v. Lynch*, 789 N.E.2d 1052, 1060, 1060 n.5 (Mass. 2003) (holding witness's alleged wearing of sunglasses would not have violated "face to face" confrontation under the Massachusetts constitution).

religious purposes. Brown wore a head scarf while testifying during [Smarr's] Preliminary Hearing and Trial. Although Brown testified that she did not always wear a head scarf, she testified that she wore it whenever she felt that it was appropriate.

*Id.*

We find the first part of the ***Craig*** test satisfied. The court found that protection of Brown's ability to exercise her religion was an important public policy,[9] and, after a hearing, made a specific, individualized finding and that allowing Brown to cover her face was necessary to further that policy. ***Cf. Coy***, 487 U.S. at 1021 (holding right to confrontation was violated where court failed to make individualized finding of necessity); ***Atkinson***, 987 A.2d at 751.

Considering the second prong of the ***Craig*** test, the trial court found that "the reliability of Brown's testimony was otherwise assured." Op. and Order at 21. Specifically, the court found the jury was amply able to observe Brown's demeanor. The court stated,

> . . . Brown was physically present in front of Defendant and she testified under oath. Brown was subject to cross-examination by [Smarr] and [Smarr] questioned her regarding her head scarf. The jury was able to sufficiently view Brown's demeanor.[9] The jury was located within close proximity to Brown. They were able to perceive Brown's tone of voice, her gestures, and any hesitation she may have exhibited in answering questions. The jury was also able to view Brown's eyes. Although Brown's mouth was covered, her nose was exposed much of the time and her scarf was pulled tightly to the point where the outline of her mouth was visible. This Court could observe when Brown was smiling or frowning.

---

[9] Smarr does not argue that protection of religion is **not** an important public policy.

- 15 -

. . . Brown's mouth and nose were the only features that may not have been visible to the jury. The jury was otherwise able to sufficiently observe Brown's demeanor during her testimony.

---

[9] Defense Counsel correctly noted during trial that "demeanor" is defined as the "outward appearance or behavior, such as facial expressions, tone of voice, gestures, and the hesitation or readiness to answer questions." Black's Law Dictionary, 523 (Bryan A. Garner, 10th ed. 2014).

*Id.* at 21-22 (citations to N.T. omitted). In addition, during trial, the court stated the scarf covering Brown's nose and mouth was somewhat transparent. Moreover, Smarr did not deny that the jury witnessed Brown "br[eak] down into tears."

Thus, the jury could view Brown's eyes, and to some extent, her facial expressions; her posture, her gestures, and her body language; hear her tone of voice, her cadence, and her hesitation; and observe any nervousness, frustration, or hostility. We therefore hold that under the second prong of the *Craig* test, the other polestars of the right to confrontation—testimony given under oath, facing the penalty of perjury, subject to cross-examination, and with the jury's observation of the witness's demeanor—were amply preserved. Smarr's right to confrontation under the federal and state constitutions was not infringed, and a new trial was not warranted.

## II. Prior Bad Acts

In his second issue, Smarr argues the court erred in allowing the Commonwealth to present Patterson's testimony that he was robbed shortly

before Gray was murdered, as the testimony was unduly prejudicial and irrelevant. Smarr asserts that Patterson testified Smarr was merely present when he (Patterson) sold drugs to Smarr's companion at the Garden Inn, and did not testify that Smarr actually participated in the drug transaction. And, Smarr argues, Patterson testified that he was robbed when leaving the Garden Inn, but that he could not identify Smarr as one of his robbers. Smarr argues that because there was no evidence linking Smarr to the robbery of Patterson, the testimony about the robbery had negligible probative value, a high potential for unfair prejudice, and invited speculation and conjecture on the part of the jury.

Our standard of review is well-settled:

Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

**Commonwealth v. Cain**, 29 A.3d 3, 6 (Pa.Super. 2011) (quoting **Commonwealth v. Montalvo**, 986 A.2d 84, 94 (Pa. 2009)).

According to Rule 404(b) of the Pennsylvania Rules of Evidence, a party may not introduce "[e]vidence of a crime, wrong, or other act" in order "to prove a persons' character." Pa.R.E. 404(b)(1). Such evidence is only admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident." ***Id.*** at (b)(2). However, in a criminal case, evidence of prior bad acts is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." ***Id.***

Evidence the defendant committed both the prior and instant crimes as part of a common scheme, plan, or design, is admissible when "the crimes are so related that proof of one tends to prove the others." ***See Commonwealth v. Ross***, 57 A.3d 85, 103 (Pa.Super. 2012) (*en banc*). A court should consider the similarities between the manner in which the crimes were committed, the purpose of the crimes, and how close they occurred in both geographic location and time. ***Id.*** at 104; ***see also Commonwealth v. Weakley***, 972 A.2d 1182, 1189 (Pa.Super. 2009); ***Commonwealth v. Judd***, 897 A.2d 1224, 1232, 1232 n.6 (Pa.Super. 2006). Identicalness between the crimes grows less important the closer in time the crimes occur. ***Ross***, 57 A.3d at 104 n.17; ***Weakley***, 972 A.2d at 1190.

Evidence of a prior crime is also admissible as evidence of the defendant's motive to commit the instant crime, if "the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances.'" ***Commonwealth v. Knox***, 142 A.3d 863, 866-67 (Pa.Super. 2016). For example, evidence that the defendant is involved in dealing drugs is admissible to show motive for killing a member of a rival organization. ***See, e.g., Commonwealth v. Busanet***, 54 A.3d 35, 61 (Pa. 2012); ***Commonwealth v. Collins***, 70 A.3d 1245, 1252 (Pa.Super. 2013); ***see also Commonwealth v. Fletcher***, 986 A.2d 759, 785 (Pa. 2009) ("When evidence

of drug involvement is relevant to prove motive, rather than criminal propensity, the introduction of such evidence is not improper").

Rule 404(b) applies only not only to evidence of prior criminal convictions, but to any evidence of prior crimes, wrongs, or acts committed by the defendant, regardless of whether the evidence constitutes "definitive proof" that the defendant committed them. *Commonwealth v. Lockcuff*, 813 A.2d 857, 861 (Pa.Super. 2002); *see also Commonwealth v. Young*, 989 A.2d 920, 926 (Pa.Super. 2010). Such evidence is therefore admissible so long as the Commonwealth presents substantial evidence that defendant committed the prior bad act. *Commonwealth v. Odum*, 584 A.2d 953, 956 (Pa.Super. 1990). Where the prior bad act did not result in a criminal conviction, direct testimony from the alleged victim may constitute substantial evidence that the defendant committed the crime, and the potential for prejudice tempered by cross-examination. *Commonwealth v. Ardinger*, 839 A.2d 1143 (Pa.Super. 2003). Potential for undue prejudice may also be ameliorated or cured by a cautionary jury instruction. *Commonwealth v. Hairston*, 84 A.3d 657, 666-67 (Pa. 2014).

In its opinion and order denying Smarr's post-sentence motion for a new trial, the court explained that the evidence related to the robbery of Patterson was relevant to prove the murder because the two crimes

> were sufficiently similar in time, place, and matter. The robbery of Patterson occurred approximately one (1) hour prior to the robbery of victim on March 14, 2015. Both robberies occurred at the Garden Inn under similar circumstances. While at the Garden Inn, Patterson and [Gray] sold drugs in a room in which [Smarr]

was present. After Patterson and [Gray] left the room, they were both confronted from behind by an individual with a firearm. The individual attempted to rob Patterson and [Gray]. The robberies were committed due to a "turf war." Based on the aforementioned factors, it is clear that the evidence was admitted to prove that [Smarr] was the individual who had committed the robbery, he was located inside of the Garden Inn prior to [Gray]'s robbery, [Smarr]'s motive for committing the robbery was a "turf war," and [Smarr] engaged in a common scheme, plan, or design when he committed the robberies because they involve substantially similar circumstances.

Op. and Order at 24-25 (citations omitted). The court also noted that it instructed the jury not to consider the evidence as proof of Smarr's character.

The court did not abuse its discretion in admitting the testimony related to the robbery of Patterson. The evidence was highly probative, as the two crimes were committed in a similar manner, for a similar purpose, had similar victims, and occurred close in time and place. Although Smarr was not charged with robbing Patterson, details related to that robbery corroborated the other evidence proffered by the Commonwealth regarding the turf war going on between rival drug dealers at the Garden Inn that night and established that Smarr, at the very least, had been involved in multiple drug sales that formed part of the conflict. Moreover, any potential prejudice was tempered by the fact that Patterson himself testified as to the robbery, and Smarr was able to cross-examine him on the fact that he could not identify Smarr as his robber. The court's cautionary instruction further ameliorated any potential prejudice. Thus, we affirm the court's orders admitting the evidence and denying the request for a new trial.

### III. Incontrovertible Physical Facts

Smarr next argues that the court erred in denying his motion for acquittal on the basis of the incontrovertible physical facts rule. Smarr claims that Dr. Wecht, who performed the autopsy on Gray, testified that the bullet entered Gray near his right armpit and traveled toward his left side, thus establishing that Gray was shot from the side at nearly a 90-degree angle. Smarr asserts that the physical fact of the bullet trajectory contradicted Brown's testimony that Smarr shot Gray while they were facing each other, and that Gray had not turned away from Smarr before being shot. Smarr argues that the alleged contradiction renders the evidence insufficient to support the murder charge.

The incontrovertible physical facts rule implicates the sufficiency of the evidence. *See Commonwealth v. Widmer*, 744 A.2d 745, 752 & n.4 (Pa. 2000). We thus employ a *de novo* standard of review. *Commonwealth v. Hall*, 199 A.3d 954, 960 (Pa.Super. 2018).

According to the incontrovertible physical facts rule, "where the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted, it being either mistaken or false, and a verdict based on it will not be sustained." *Commonwealth v. Newman*, 470 A.2d 976, 979 (Pa.Super. 1984) (quoting *Lamp v. Pennsylvania R.R.*, 158 A. 269, 271 (Pa. 1931)). The purpose of the rule is to allow courts to disregard "that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible." *Id.* (quoting

*Lamp*, 158 A. at 271). The rule has no application unless "the facts are positive, clear, indisputable, and certain." *Id.*[10] Notably, the rule does not require the jury to reject the portions of the witness's testimony that remain uncontradicted. *Id.*

Here, even assuming Dr. Wecht's testimony that Gray's bullet wound established that he was shot more from the side than the front constituted an "incontrovertible physical fact" under the rule (which we do not so hold), this testimony did not directly contradict Brown's testimony regarding the shooting. Brown was never specifically asked whether Gray was standing at an angle when facing his shooter. Although Smarr's counsel asked Brown, "did [Gray] turn and go to run?," and Brown responded "No. There wasn't enough time for that," Brown was responding to a compound question, and therefore may have been responding to whether Gray had tried to run away and not addressing whether Gray had been turning or standing at an angle. Brown also testified that she could not remember how Gray's arms were positioned when he was shot, and testified that Gray was shot near his right armpit. Dr. Wecht testified that Gray may have turned without even moving his feet.

Given the foregoing, we conclude that Dr. Wecht's testimony regarding the bullet trajectory did not expose Brown's minimal testimony regarding

_____

[10] *See also Mike's Sign Co. v. Dep't of Transp.*, 642 A.2d 634, 637 (Pa.Cmwlth.Ct. 1994) ("[W]here the Court cannot say as a matter of law that the testimony of a witness is contrary to scientific principles or the laws of nature, the question of the conflict in the evidence is still for the fact-finder to resolve" (emphasis omitted)).

Gray's positioning when he was shot as "contrary to human experience and the laws of nature." **Newman**, 470 A.2d at 979. Any conflict in the evidence regarding the manner in which Gray was shot was therefore a matter of weight and credibility of evidence, and a question properly placed before the jury. Moreover, even if the court had stricken Brown's testimony regarding the exact position in which Gray was standing in relation to his shooter at the time he was shot, the rest of Brown's testimony, which the jury clearly credited, established that Smarr was the shooter. We thus affirm the trial court's denial of a judgment of acquittal.

## IV. Consciousness of Guilt

In his final issue, Smarr argues the trial court erred in denying his objection to Corporal Mazurik's testimony regarding the deactivation of Smarr's purported Facebook account.[11] Smarr argues there was no evidence that he had caused the account to be deactivated, and that consciousness of guilt cannot be demonstrated through the actions of third parties unless there is evidence that those actions are attributable to the defendant.[12]

_____

[11] Smarr does not argue that the testimony that Corporal Mazurik viewed a Facebook account showing Smarr's photo and nickname was irrelevant or inadmissible.

[12] Smarr tangentially argues that the evidence of deactivation lacked authentication. Prior to Corporal Mazurik's testimony, Smarr argued that the **photographic evidence** obtained from Facebook was overly prejudicial and lacked authentication. The court excluded the photographic evidence, finding that it was overly prejudicial, but permitted the testimony regarding the police's viewing of the Facebook account as relevant to establish the course

"When a person knows that he is wanted in connection with a criminal investigation, and flees or conceals himself, such conduct is admissible as evidence of consciousness of guilt." ***Commonwealth v. Hudson***, 955 A.2d 1031, 1036 (Pa.Super. 2008). "'Concealment' . . . connotes an attempt to hide or avoid recognition." ***Commonwealth v. Bruce***, 717 A.2d 1033, 1038 (Pa.Super. 1998). As stated above, we will not reverse a trial court's ruling on an evidentiary matter absent an abuse of discretion. ***Cain***, 29 A.3d at 6.

Corporal Mazurik testified on direct examination that he had been unable to view the Facebook account bearing Smarr's likeness and nickname subsequent to his first viewing because it appeared to be deactivated. On cross-examination, Corporal Mazurik testified that he did not know, and had no way of knowing, whether Smarr himself had deactivated the account. He also testified that he did not know whether the account had been deactivated in an effort to hide Smarr's identity by the police, and no other evidence established that Smarr had attempted to conceal his identity in the days following the murder.

As Corporal Mazurik did not indicate that a third party was responsible for deactivating the account, we reject Smarr's argument that the Commonwealth was required to establish that Smarr was responsible for the

---

of conduct of the officers. As the only evidence that a Facebook account existed and was deactivated was through the oral testimony of Corporal Mazurik, we find Smarr's argument related to authentication misplaced.

deactivation to a greater degree than that which applies to the admissibility of any other evidence of a defendant's actions.

Moreover, we conclude the evidence was unlikely to cause undue prejudice. The jury was aware that there was no more than an inference that Smarr had deactivated the account himself, or that he had done so to evade capture. In addition, the testimony regarding the deactivation of the Facebook account was not inflammatory, and constituted only a minor part of the evidence against Smarr and formed only a minor part of the Commonwealth's closing argument. We conclude the trial court did not err in overruling Smarr's objection to the testimony.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/3/2019